[See note to Case No. 11,404.]

---

## Case No. 11,406.

PREVOST v. GRATZ et al.

[1 Pet. C. C. 364.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1816.[2]

TRUSTS—HOW ESTABLISHED — PROOF — DECLARATION OF TRUST—GAINS AND PROFITS—TRUSTEE'S PURCHASE—DEED — ERASURE — PRESUMPTION OF ACQUIESCENCE.

1. To establish a trust, the proof lies on the party who alleges it.

2. Where the grantee in a conveyance of a tract of land, had in an account between him and the grantor, made out subsequent to the execution of the deed, given the grantor credit for the proceeds of the sale of part of the land conveyed by the deed, this credit was held to amount to a declaration of trust, so as to repel the idea that the conveyance was intended to be absolute.
[Cited in brief in Miltenberger v. Morrison, 39 Mo. 75.]

3. When land is conveyed for a consideration which is to be afterwards ascertained by the price at which the grantee may sell it, there arises a resulting trust to the grantor, until the sale is made; and the grantee becomes a trustee, subject to all the equitable rules, which would have bound him had the deed in express terms empowered him to sell for the use of the grantor; and the grantor has in both cases an equal interest in the sale, and the same claim upon the best exertions of the grantee to obtain the highest price which the property will command.

4. Whatever profit is gained by a trustee by the sale of property held by him in trust, belongs to the cestui que trust; and a trustee can never purchase or hold the property, discharged of the equity of the cestui que trust to call upon him, in a reasonable time, to account for the profit, or to have a re-sale.
[Cited in Boynton v. Dyer, 18 Pick. 6. Cited in brief in Kennedy v. Keating, 34 Mo. 26; Meanor v. Hamilton, 27 Pa. St. 139.]

5. A purchase made by a trustee is not absolutely void, but voidable at the election of the cestui que trust, if he is dissatisfied with it, and in a reasonable time afterwards impeaches its validity. But, if after a knowledge of it he

[1] [Reported by Richard Peters, Jr., Esq.]
[2] [Reversed in 6 Wheat. (19 U. S.) 481.]

acquiesces in it, the sale will be valid both in courts of law and equity.
[Cited in brief in Appeal of During, 13 Pa. St. 234. Cited in Ashburst's Appeal, 60 Pa. St. 315. Cited in brief in Campbell v. McLain, 51 Pa. St. 202; Fisher's Appeal, 34 Pa. St. 30. Cited in Hays v. Heidelberg, 9 Pa. St. 210. Disapproved in Marshall v. Carson, 38 N. J. Eq. 256. Cited in McKean & Elk Land & Imp. Co. v. Clay, 149 Pa. St. 277, 24 Atl. 213; Wesley Church v. Moore, 10 Pa. St. 273.]

6. An erasure in a deed, not shown to have been made before execution, is sufficient to avoid it, upon the plea of non est factum. The presumption in such a case is, that the alteration was made after the execution of the deed; and the same presumption arises in reference to a settled account, in which an erasure or alteration has been made.
[Cited in Bailey v. Taylor, 11 Conn. 535; Beaman v. Russell, 20 Vt. 210; Hills v. Barnes, 11 N. H. 397; Pipes v. Hardesty, 9 La. Ann. 152; Somerset v. Rehoboth, 6 Cush. 320.]

7. Length of time affords no presumption of an acquiescence in a purchase by a trustee of property held by him in trust, unless it appears that the cestui que trust had notice that the trustee had become the purchaser.
[Cited in Piatt v. Oliver, Case No. 11,115.]

8. A creditor who, after he is so, becomes a trustee for his debtor, does not by that act, impair rights which he had antecedently acquired against him.

9. If a trustee, executor or agent, buy in debts due by his cestui que trust, testator, or principal, for less than their nominal amount, the benefit arising therefrom belongs to the person for whom he acted.
[Cited in Oakley v. Hibbard, 1 Pin. 683.]

10. A court of equity will not permit a person acting as a trustee, to create in himself an interest opposite to that of his cestui que trust or principal. It is otherwise if the trustee was a creditor before the trust arose, in which case, he may pursue the same legal means for enforcing payment of his debt, which would have been open to him, had he not become a trustee.

11. There is no principle of equity which will invalidate the title of a trustee to land, which the law has taken out of his hands, and which he has purchased from one appointed to sell it. The reasons which forbid a trustee to purchase the trust property, where he is the seller, do not apply to such a case.
[Cited in Allen v. Gillette, 127 U. S. 596, 8 Sup. Ct. 1334.]
[Cited in Chorpenning's Appeal, 32 Pa. St. 317.]

12. Where a party has had it in his power to ascertain the importance of testimony before the hearing of his case, and has neglected to do so, and to obtain the testimony, a court of equity will not grant a re-hearing of the case, on the ground that the importance of the evidence had been ascertained after the decision, although the justice of the case might be promoted by it.
[Cited in Ruggles v. Eddy, Case No. 12,118; De Florez v. Raynolds, Id. 3,743; Page v. Holmes Burglar Alarm Tel. Co., 2 Fed. 333; Spill v. Celluloid Manuf'g Co., 22 Fed. 96; Witter v. Sowles, 31 Fed. 10.]
[Cited in Mulock v. Mulock, 28 N. J. Eq. 18; Lyon v. Bolling, 14 Ala. 753.]

This case was argued at the last term, and was taken under advisement until the present. It was a bill filed on the equity side of the court, by [George W. Prevost,] the administrator (de bonis non) with the will annexed of George Croghan, deceased, against

the administrators of M. Gratz, deceased, who was one of the executors of G. Croghan. The bill charges M. Gratz and B. Gratz (whose representatives are no parties) with sundry breaches of trust committed during the life time of G. Croghan, and with waste, mismanagement, and neglect of duty in relation to the assets which came to their hands, after G. Croghan's death.

WASHINGTON, Circuit Justice. Many of the charges contained in this bill, were either abandoned, or not seriously pressed at the argument of this cause, and the complainant's counsel confined themselves in a great measure, to the three following grounds of complaint, and to some others of minor importance. The first respects a tract of land lying on Tenederah river, in the state of New York, which was conveyed by G. Croghan to M. Gratz, as containing 9050 acres, by deed bearing date the second of March, 1770, for the consideration of £1800. The complainant contends, that this conveyance, though absolute in form, was made under a secret trust, to be sold for the benefit of the grantor; and upon this ground he claims the amount for which this land was afterwards sold by M. Gratz, after the death of G. Croghan, with interest thereon to this time. This trust is denied by the defendants, or, if it existed, they contend that the land was afterwards purchased by M. Gratz, the trustee, with the consent of G. Croghan, for the sum of £850. 15s., New York currency.

The questions then are, first, was the sale to M. Gratz absolute as the conveyance purports, or was it in trust to sell for the benefit of the grantor; and if in trust, then, secondly, is the complainant entitled under all the circumstances of the case, to claim the amount for which the land was actually sold by M. Gratz?

First. To establish a trust, the proof lies on the complainant. The deed upon the face of it is absolute, and contains covenants unusual and unnecessary in a deed of trust, such as a general warranty, and others, in relation to the title of the grantor. It is also worthy of remark, that the other absolute deeds made by G. Croghan to B. Gratz, were followed soon after by a declaration of trust, which was not made as to this land.

But, strong as these circumstances are to warrant a presumption consistent with the terms of the deed, they are outweighed by the account of the 30th of March, 1775, settled between M. and B. Gratz and G. Croghan, in which the latter is credited for "cash received in August, 1774, from Howard, for the tract of land on Tenederah, sold to him by M. Gratz, with interest from the day of sale, —— pounds." The account found amongst the papers of M. Gratz, which is endorsed to be a copy of that delivered to G. Croghan, differs no otherwise from it, than by the pen being drawn through the word "Howard," and the interlining of the

words "Michael Gratz." But if either of those persons was the purchaser from G. Croghan, in August, 1774, it follows that M. Gratz could not have been the purchaser in the year 1770. This credit, therefore, amounts to a clear declaration of the trust, so as completely to repel the idea that the conveyance to M. Gratz at that time, was intended to be absolute. What the real intention of the parties was, it is not easy from the evidence to determine. Yet it seems not improbable, that the land was conveyed as a security for a debt which was then due by G. Croghan to M. Gratz, that he might sell the same and apply the proceeds towards its discharge. It appears by the before mentioned settled account of March, 1775, that at the time this conveyance was made, G. Croghan was considerably indebted to M. and B. Gratz; and a memorandum subjoined to another account, No. 13, in the handwriting of G. Croghan, goes strongly to show that this land had been conveyed to M. Gratz, for a price not determined upon between the parties, but which was to be afterwards fixed, either by a sale, or by the subsequent agreement of the parties. But, whether the intention of this conveyance was that which has been just mentioned, or that which the complainant's counsel contend for, is not important in the view of a court of equity. For, where land is conveyed for a consideration which is to be afterwards ascertained by the price at which the grantee may sell it, there arises a resulting trust to the grantor until the sale is made, and the grantee becomes a trustee, subject to all the equitable rules which would have bound him, had the deed in express terms empowered him to sell for the use of the grantor. In both cases, the grantor is equally interested in the sale which the grantee is to make, and has the same claim upon his best exertions to obtain the highest price which the property will command.

Second. The next question is, is the complainant entitled, under the circumstances of this case, to claim all the profit which M. Gratz has made by the resale of this land? Nothing can be more just than the principles which govern a court of equity in relation to purchases made by the trustee of the trust property. He pledges his honest endeavours to promote the interest of the cestui que trust, by disposing of the property on the best terms which he can obtain; and equity will not permit him to create an interest in himself, inconsistent with this pledge, and which may seduce him from an upright fulfilment of his duty. Whatever profit is gained by the sale belongs to the cestui que trust, and the trustee can never purchase or hold the property discharged of the equity of the cestui que trust, to call upon him, in a reasonable time, to account for this profit, or to have a re-sale. The purchase, however, by the trustee, is not absolutely void, but voidable at the election of the cestui que trust, if he is dissatisfied with

it, and in a reasonable time after a knowledge of the fact impeaches its validity. But, if after such knowledge he confirms the sale, or unequivocally acquiesces in it, it will stand ratified by those general principles, which prevail as well in courts of law as of equity. M. Gratz, the trustee, having in this case, become the purchaser of this land, the only remaining inquiry is, was the purchase confirmed or acquiesced in by G. Croghan, after a full knowledge of that fact?

Here, unfortunately, we are left to wander very much in the field of conjecture. The evidence in the cause sheds a very feeble light upon this transaction. The account of the 30th of March, 1775, found amongst the papers of G. Croghan, informed him, that the land had been sold to a man of the name of Howard, for a certain sum, which in August, 1774, had been received by the trustee, and therefore interest is credited. This was not true in fact, as the evidence in the cause most abundantly proves, and as the defendants' counsel are compelled to admit. The counterpart of this account retained by M. Gratz, and found amongst his papers, having the signature of G. Croghan to it, states that M. Gratz, and not Howard, was the purchaser. If the erasure of Howard's name and the substitution of M. Gratz, were made prior to the signature of G. Croghan, the evidence of his knowledge of the fact that M. Gratz was the purchaser, and of his acquiescence, would be complete. This then is the turning point of this part of the cause. When were the erasure and interlineation made? If after the account was seen and approved by G. Croghan, it was, to say the least of it, a very unwarrantable act, and such as the court would feel very unwilling, lightly, to impute to a man whose character has not been impeached, and who appears to have possessed during his life, the undiminished confidence of G. Croghan, and, after his death, of Colonel Prevost. Neither does it appear that he could have had any sufficient inducement to practise a deception of this kind, as it would seem from the evidence, that the price of the land credited in the account was about its real value at the time of the alleged sale of it. But, notwithstanding these favourable circumstances, and the strong inclination of my mind, as a man, to acquit M. Gratz of improper conduct in this transaction, I feel myself compelled, as a judge, to say, that the weight of the evidence is against the defendants. I find upon the face of the before mentioned account, retained by M. Gratz, as a copy of the one delivered to G. Croghan, a material erazure, and interlineation, made in the hand writing of M. Gratz himself; and all this unexplained by any evidence whatever tending to show at what time they were made. These of themselves would be sufficient, upon the plea of non est factum to a deed, to avoid it. The presumption in such a case is that the alteration was made after the execution of the deed, and the same presumption arises in reference to a settled account. But, in this case a counterpart of the account was delivered to G. Croghan, and remained in his possession, in which no such erazure and interlineation appear. Were this a deed, then, what further evidence could be required, to prove that the alteration had been made by M. Gratz, after the signature of G. Croghan, than to produce the counterpart, and to show the variance?

It was said in behalf of the defendants, that the account delivered to G. Croghan, was probably made out by B. Gratz at Pittsburgh, where it bears date, under a mistake of his, that his brother had in fact sold the land to Howard; and that a parol contract for such a sale may have been made, but was not carried into execution; in consequence of which, the correction was made by M. Gratz, with the assent of G. Croghan, after he received the counterpart of that account. These conjectures may possibly be all true, but they are inconsistent with the evidence which the accounts themselves furnish, and there is not a solitary circumstance in the cause to countenance them. Both accounts bear date at Pittsburgh on the same day, and the one retained by M. Gratz, having the signature of G. Croghan, is, by an indorsement on it in the handwriting of M. Gratz, declared to be a copy of the account delivered to G. Croghan. The necessary presumption, then, is that the one account was delivered, and the other received the signature of G. Croghan, at the place and on the day so stated.

Upon the whole, I am brought to this conclusion, that G. Croghan did not know, and therefore could not confirm or acquiesce in the purchase by M. Gratz, so as to bar his equitable title to call for an account of the profit made of this property by his trustee. The antiquity of this claim—the apparent satisfaction of G. Croghan with the price at which the land was credited by M. Gratz—and the injustice of giving to the representatives of G. Croghan so enormous a profit as the subsequent rise in the value of this land would afford—have been strongly pressed upon the court by the defendants' counsel, as reasons for rejecting this claim. But length of time affords no presumption of an acquiescence; without which, or an express confirmation by the cestui que trust, the trustee can acquire no valid title, unless it appears that the cestui que trust had notice that the trustee had become the purchaser. Now in this case, there is not only the absence of all evidence of such notice, but the account left with G. Croghan, was calculated to impress him with a different belief, and to put a stop to all inquiry. If G. Croghan was informed of the fact, yet, from the absence of evidence to prove that he was so, the conclusion of law must necessarily be against the defendants, they will suffer as many others have done, from a similar cause. M. Gratz might easily have placed his title beyond the possibility

of danger, by taking some written acknowledgment from G. Croghan to sanction it; and his omission to do this, proves. either that he was chargeable with inexcusable negligence, or that no notice was given to G. Croghan, who was the real purchaser. If no such notice was given, then the land never did belong to M. Gratz, and there can be no hardship in compelling his representatives to account with the real owner, for the profit made by their testator, upon the sale of property to which he had no title, with interest on the same.

The second ground of complaint respects a judgment obtained by the representatives of W. M'Ilvaine, against G. Croghan, which was purchased by B. Gratz, during the life of G. Croghan, and was by him assigned to one of the defendants, who, under one or more executions issued on that judgment, became the purchaser of sundry tracts of lands, formerly the property of G. Croghan.

The material facts are as follows:—On the 30th of March, 1769, G. Croghan gave his bond to W. M'Ilvaine for the sum of four hundred pounds, which debt, by the will of M'Ilvaine, became vested in his widow, who afterwards intermarried with John Clark. A judgment was obtained upon this bond against G. Croghan, in the year 1774 or 1775, in the name of Wm. Humphreys, the executor of M'Ilvaine, and a fieri facias was issued thereon, returnable to April term, 1775. In March preceding the return day, B. Gratz purchased this judgment from Clark, and received an assignment thereof, for which he gave his own bond for three hundred pounds, with interest. B. Gratz having failed to discharge the whole of this bond, was sued by Clark, and a judgment was recovered against him, in the year 1794, for eighty-nine pounds six shillings and ten pence, the balance due, which sum was afterwards paid by M. Gratz. Sometime in the year 1800, B. Gratz assigned the judgment against G. Croghan to his nephew, Simon Gratz, one of the defendants, partly in consideration of natural affection, and partly in consideration of the above sum paid by M. Gratz. Simon Gratz having thus become the beneficial owner of this judgment, proceeded to issue executions thereon, after the death of G. Croghan, under which sundry tracts of land, amounting in the whole to about 1600 acres, were seized and sold, and were purchased by Simon Gratz for about 1000 dollars. On the 16th of May, 1775, G. Croghan, by two deeds of that date, for a valuable consideration expressed therein, conveyed to B. Gratz about 45,000 acres of land; but, by a declaration of trust, executed by B. Gratz on the 2d of June, 1775, he acknowledged that these deeds were intended to be in trust, to enable the said B. Gratz to sell the said lands, and with the proceeds to discharge certain enumerated debts, due by G. Croghan, amongst which is that of Clark; and B. Gratz covenanted to account with G. Croghan for the sales of these lands, as soon as he could dispose of them. Upon these facts, it is contended by the complainant's counsel, that B. Gratz ought to be considered by this court, as having purchased the above judgment with the trust funds, and consequently for the benefit of G. Croghan; and that even if it was purchased with his own money, still, being a trustee for Croghan, the purchase should be considered as having been made for his benefit, entitling B. Gratz to claim no more than the sum which he actually paid, and to retain the same out of G. Croghan's estate, the whole of which is charged with the payment of his debts. That Simon Gratz, being an assignee of this judgment, with notice of the trust, and without a valuable consideration paid for the same, can stand in no better situation than the assignor did, and ought therefore to be treated as a trustee for the estate of G. Croghan, of the lands which he purchased under the executions issued on that judgment, and be entitled to claim, merely the sum actually paid by B. Gratz, with interest.

It is to be observed in the first place, that there is not the slightest evidence on which to ground a presumption, that this judgment was purchased with trust funds. B. Gratz gave his own bond for the 300 pounds, at which time he and M. Gratz were considerably the creditors of G. Croghan; and it further appears by the exhibits in the cause, that the accounts between these parties, were regularly settled from time to time, leaving at each settlement a balance against G. Croghan. Neither did any funds arise from the trust property, no part of the same having at any time been sold by the trustee.

As to the argument predicated upon the admission, that the purchase was made upon the credit and with the funds of B. Gratz, I hold it to be altogether untenable. B. Gratz became the purchaser some months before the date of the conveyances to him, of the 45,000 acres of land, and I am yet to learn upon what principle of equity it is, that a creditor, who after he is so, becomes a trustee for his debtor, does by that act impair or affect rights which he had antecedently acquired against him. I admit the soundness of the doctrine laid down by the complainant's counsel, that if a trustee, executor, or agent, buy in debts due by his cestui que trust, testator, or principal, for less than their nominal amount, the benefit gained thereby belongs not to him, but to the person for whom he acted. A court of equity will not permit a person, acting as a trustee, to create in himself an interest opposite to that of his cestui que trust or principal. But this doctrine is inapplicable to the case of a fair bona fide creditor, who became so, prior to the assumption of his fiduciary character. In such a case he is entitled to claim the full amount of what was due from his cestui que trust, &c. and the latter has no right to inquire how much the former paid for it; so too, the

trustee, &c. may pursue all legal remedies for enforcing payment of the debt, which would have been open to him if he had not become a trustee.

It is said, however, that the declaration of trust of 2d July, 1775, contains a promise to discharge this very debt out of the trust property, as soon as the same could be disposed of. But it was not disposed of, and there are the strongest reasons for believing that it was altogether unsaleable. Independent of the doubts which clouded the title, it would seem sufficient to observe, that B. Gratz had the strongest temptations to sell, and even to sacrifice this property, if it had been possible to dispose of it upon any terms.

It is further contended, that the power of attorney given by G. Croghan, to B. and M. Gratz, dated the 10th of July, 1772, constituted them trustees of all his lands, with unlimited power to sell them and to pay off his debts. It is in this part of the case, that I experience the difficulty of deciding satisfactorily to myself in consequence of the antiquity of these transactions, and the death of all those who might have explained them. What became of this power of attorney, and why it was never acted upon, are questions which no evidence in the cause enables me to resolve. There are, however, strong reasons for presuming, that the powers vested in these agents, were found unproductive of any useful results; and, that the instrument which bestowed them, was afterwards delivered back to G. Croghan, or remaining with the Gratzes was considered by all the parties as a blank paper. This conjecture is strongly countenanced by the fact, that this paper, as well as the deeds of May, 1775, was found amongst the papers of G. Croghan, after his death. These very deeds furnish themselves the most persuasive evidence in support of this presumption. For if the general power to sell the whole of G. Croghan's lands, continued in force up to the year 1775, there could have been no necessity for giving to one of those agents, an authority to sell a part of them. The fact, that no part of those lands was sold by the agents, or by Croghan himself, without a complaint having been uttered by the latter, that appears, is nearly conclusive to prove that they were unsaleable.

Another point insisted upon by the complainant's counsel under this head is, that G. Croghan was not in reality a debtor to M'Ilvaine, inasmuch as there was found amongst Croghan's papers, a bond of M'Ilvaine to him, dated the 5th of March, 1769, with condition that M'Ilvaine should by a certain day re-convey to Croghan, certain lands lying in Virginia, which Croghan had conveyed to M'Ilvaine in trust for the payment of a particular debt, or in case it should not be in his power to make such conveyance, then to pay to Croghan the sum of £400. It was contended, that this bond being found uncancelled amongst the papers of the obli-

gee, proves that neither of the conditions had been performed. The short, but conclusive answer to this argument is, that the condition of this bond was to be performed in the year 1770, and that if it was broken by the failure of M'Ilvaine to make the re-conveyance, M'Ilvaine became in that year a debtor to G. Croghan in the sum of £400 the equivalent; yet Croghan suffered judgment to pass against him, and execution to issue in the year 1775, after which he lived about seven years, without having brought a suit on the bond, or asserted in any manner whatever a right to the money. If after a lapse of so many years, and under these strong circumstances, the court is not bound to presume against the existence of this debt, I know of no instance in which such a presumption ought to be made. If in truth the debt was really due, the charge of neglect is fairly imputable to Croghan, but not to his executors. Upon the whole I am of opinion, upon this point, that the complainant is entitled to no relief.

The next question for consideration is, whether the complainant is entitled to call upon the defendants for an account of the personal estate of G. Croghan, which came to the hands of B. and M. Gratz, his executors, or which they might have received? As to the estate, of which an inventory was duly returned, it appears that the whole of it was sold and accounted for by Mr. Powel, another of the executors. There is not the slightest evidence that any of the testator's lands were sold by his executors, and the charge in the bill that such sales were made, is denied in the answer, so far as the defendants could deny it. The only question therefore is, whether an account ought to be directed of the credits stated in the exhibit E., taken after the death of G. Croghan? The bill calls upon the defendants to say, whether all or any of these debts were collected by the executors. In their answer, the defendants state, that they do not know or believe, that any of them were collected, but that they believe, that the whole of them were desperate at the time of G. Croghan's death, or were merely nominal, being unsupported by any evidence or liable to offsets, to their full amount. The debts contained in this list, consist of specialties and notes for the payment of money, bonds with collateral conditions, and open accounts. The complainant's counsel contend, that it is incumbent on the defendants, to show, that these debts were desperate or not due, or that the executors used due diligence to recover them and were unable to do so; that having failed to establish either of these grounds of excuse, the executors became personally liable for the amount of those debts. If I thought that by directing an account, the auditor could throw any light upon this subject, which does not appear in the present state of the cause, I might feel it a duty to make such an order. But it is manifest from the answer and ex-

hibits now before the court, that the defendants can furnish no further explanations. than they have already given; and it would therefore be improper to expose the parties to this additional expense.

The question is, whether under all the circumstances of this case, the defendants ought to be compelled to account for the credits stated in exhibit E.? And this I am now prepared to decide. What are those circumstances? G. Croghan died in the year 1782, at which time almost the whole of these debts, which were not specialties, were barred by the act of limitation; and the most modern of even the specialties, had been due nine or ten years. Though a very large land-holder, it is most obvious that Croghan was always in want of money and was considerably involved in debt. The power of attorney to B. and M. Gratz in 1772, and the subsequent deeds of trust, together with exhibit F. afford strong evidence of these facts. B. and M. Gratz were at all times his creditors, and were therefore under the strongest temptation of interest, not only to sell his lands, but to collect these debts. The necessities of Croghan were such as to stimulate him during his life to similar exertions, and to withhold indulgencies from his debtors. Upon what other ground can we account for the failure of all these parties to collect these debts, than this; that for some reason or other, payment of them could not be enforced? Soon after the death of Croghan, Colonel Prevost, residuary devisee by marriage with his only child, came to Pennsylvania; where he resided for some years, and interfered so extensively in the affairs of the estate, with the free consent and approbation of B. and M. Gratz, that he would appear from his correspondence with those gentlemen, to have been the active and they merely the nominal executors. So early as the year 1784, he called upon the executors for a statement of the affairs of the estate, and no doubt received it, as we hear of no complaint from him against these executors at any time; but on the contrary they appear throughout, to have possessed his entire confidence and friendship. There is every reason to believe that he had at all times free access to the papers relating to the estate, and made such use of them as he thought proper. After aiding the executors for ten or eleven years to wind up the business of the estate, he withdrew altogether from further participation in their duties, intimating his opinion, that any further exertions would be unavailing. Such appears most clearly to have been the opinion of the executors, who it appears were obliged to advance their own money for the small sums necessary for prosecuting such suits as were instituted, and for defraying their travelling expenses. From the year 1793, we hear no more of Colonel Prevost, and in the year 1812, thirty years after the death of G. Croghan, this suit was brought. If there ever was a case, where presumptions ought to be made in favour of executors, this is surely one. If Colonel Prevost had been under any disability to investigate the conduct of those gentlemen, or if he had been denied information necessary for him to possess, different considerations would have resulted. But no such disability or ignorance is even pretended, and I therefore feel myself compelled to say, that the circumstances of this case do so fully support the allegations of the answer in relation to these debts, that an account ought not to be directed. Under this head, it may be proper to notice a claim which was made by the complainant's counsel, though not seriously pressed, in relation to a tract of land purchased by M. Gratz at a sheriff's sale, under a judgment and execution of one Spears; for the profit made upon which, it was contended the defendants ought to account.

But I conceive that the rule laid down in respect to the Tenederah lands, does not apply to this case. I know of no principle of equity which will invalidate the title of a trustee to land, which the law has taken out of his hands, and which he purchased from one appointed by the same authority to sell it. This is precisely like the case of an executor, who purchases at a sheriff's sale the personal property of his testator, seized and sold under execution. The reasons which forbid a trustee from purchasing the trust property, where he himself is the seller, do not apply to such a case. An account has also been asked of 18,580 acres of land, which were conveyed by G. Croghan to M. Gratz, by deed dated the 29th of April, 1779, under a suspicion which the counsel entertain, that this sale was not a real one. The answer to this claim is, that there is not the slightest evidence to countenance this suspicion; and there is no reason for supposing that a reference to the auditor, will throw any additional light on this subject.

I shall therefore decree an account of the profits made by M. Gratz, upon the purchase and sale of the Tenederah land, with interest thereon, allowing to the defendants all just discounts, and dismiss the bill as to all the other matters contained in it.

After the decree was pronounced in the above case, the defendants applied for a rehearing, upon the ground of after discovered evidence. The affidavit stated, that since the decree, the defendants upon examining the papers in their possession, were led to conclude that a Mr. Symons of Baltimore might know something in relation to the Tenederah land, in consequence of which they had called on him and obtained his affidavit. This affidavit states that G. Croghan knew that those lands were purchased by M. Gratz. Cases cited against the motion; 2 Freem. 31; 1 Hen. & M. 177; Coop. Eq. Prac. 91.

WASHINGTON, Circuit Justice. I feel the strongest disposition to grant this motion be-

cause I am satisfied that the justice of the case would be promoted by it. But I should deviate so far from well established rules, and should open a door to such glaring inconveniences, that I dare not indulge this inclination. The means whence this information was obtained, leading to this newly discovered evidence, have been in the possession of the defendants from the time when this suit was instituted; and their not obtaining the evidence, in time for the hearing, arose from the inattention or misjudgment of the defendants, neither of which is sufficient to entitle the party to a re-hearing.

[NOTE. Pursuant to an order of the court, a reference was made to an auditor. This cause then came before the court on exceptions to the auditor's report. The first exception taken by complainant, to so much of the report as debits him with the sum of £484 and interest from the 30th of April, 1775, was allowed. The second exception taken by complainant, to the refusal of the auditor to allow to the complainant a credit for £198. 2s., was overruled. The third exception to the allowance of too large a credit to the defendants for agency, commission, etc., was also overruled. Case No. 11,407. On appeal to the supreme court the decree of this court was reversed. 6 Wheat. (19 U. S.) 481.]