# Richmond.

OSCAR SWINEFORD, ET AL. V. VIRGINIA TRUST COMPANY, ET ALS.

March 13, 1930.

Absent, Prentis, C. J., and Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*M. A. Cogbill, Charles R. Purdy* and *M. J. Fulton,* for the appellants.

*A. B. Dickinson,* for the appellees.

HOLT, J., delivered the opinion of the court.

In 1896, Howard Swineford, now dead, owned a tract of land in Chesterfield county, known as "Shady Springs", containing 521 acres. On August 5th of that year he conveyed to his wife, Marcia D. Swineford, 220 acres, sometimes referred to in the record as the "dower portion" which left him the owner of the residue of 301 acres.

On January 20, 1920, Mr. Swineford and his wife executed to Howard Sutton, as trustee, a deed of trust to secure $16,000.00, money borrowed by Mr. Swineford. This deed conveyed both the land which Mr. Swineford had transferred to his wife and that which he had retained. Such was the condition of the title property on April 11, 1923, the date of Mr. Swineford's death. He died testate naming as his executors the Virginia Trust Company and a son, Oscar, both of whom qualified. His will authorized his personal representatives to sell his real estate and to divide the net proceeds therefrom equally between his four children, Mary S. Danner, Oscar Swineford, Edward Agnew Swineford and Howard Lashelle Swineford.

On May 14, 1923, the widow conveyed her 220 acre tract to the Virginia Trust Company, trustee, with power to sell, publicly or privately, upon such terms as might be deemed best. The trustee was authorized to have this land surveyed and platted and was directed to apply whatever was realized from sales so far as might be necessary to liens resting thereon and to in-

vest the residue, if any, and to pay over to her income arising thereupon during her lifetime. At her death any funds and securities in hand were to be equally divided among her four children and any lands unsold should be divided in like manner among them. The trustee was also authorized to pay taxes and was given a lien for any payment so made; but it was provided that there was no duty on it to make advancements of this character. Mrs. Swineford died, testate, on October 7, 1926. She, too, appointed the Virginia Trust Company her executor and directed that such real estate as she then owned be equally divided among her four children.

Howard Swineford, in his lifetime, conceived the idea that it would be well to subdivide this land and sell it as surburban property, and it was in harmony with this that Mrs. Swineford conveyed her 220 acres to the Virginia Trust Company that the development might be carried out as a single undertaking.

The Swineford children either had no funds available or were unwilling to make the necessary advancements. They induced the trust company to make them and on September 3, 1924, addressed to it this letter:

"RICHMOND, VIRGINIA, September 3, 1924·
"VIRGINIA TRUST COMPANY AND OSCAR SWINEFORD,
    "Executors Estate of Howard Swineford,
      "Richmond, Va.
"GENTLEMEN:

"In connection with the real estate belonging to our father, we are writing this letter to you as executors of his estate, to authorize and empower you to handle the property in such way as you think for the best interest of the estate, and especially to empower you, under full protection of any equity we may have in the estate, to make such advances and incur such expenses as you

may deem wise for the purpose of mapping, subdividing, opening up roadways, installing culverts, and in any other way properly developing the property as you may see fit to do, we and each of us hereby agreeing to save you harmless, to the extent of our interest in the estate, against any loss by reason of any advances you may make or such expenses as you may incur.

"Very truly yours,
"H. L. Swineford
"E. A. Swineford
"Mary S. Danner
"Oscar Swineford."

These executors proceeded to have this property surveyed and platted. Mr. Oscar Swineford acted as engineer and for his services as such $75.00 a month for six months was advanced to him by the trust company. To prevent a sale under the Sutton trust deed, the trust company paid interest on that indebtedness. It also paid taxes, insurance, etc. These executors, with unflagging zeal, undertook to sell. It was extensively advertised and apparently listed with every real estate agent in Richmond. Mr. Oscar Swineford puts the number at 252. It was offered privately for a crippled children's hospital, as a jail farm for the city of Richmond, etc., but without success.

The executors then secured the services of the Atlantic Coast Realty Company, a corporation which made a specialty of auction sales of land. That company, after extensive advertising, held an auction on the premises on July 20, 1925. Sales aggregating about $24,900.00 were made, but Mr. Oscar Swineford objected to the confirmation of any of them and so that effort came to nothing.

On November 9, 1925, both of these executors gave to C. L. and H. L. Denoon, real estate agents, power to

sell at $31,500.00, or $30,000.00 net to the estate. On November 11, 1925, Messrs. J. Scott Parrish, James G. Hening and T. F. Jeffress, responsible gentlemen, agreed in writing to buy this land from these agents at the price named.

Howard Swineford endorsed for his son, Oscar, a note of $1,500.00 which was discounted by the Broadway National Bank of Richmond, Virginia. That note was reduced to judgment after Mr. Swineford's death and the judgment creditor filed a creditor's bill in the Circuit Court of Chesterfield county. The trust company answered and among other things asked that the sale to Jeffress and others be confirmed. Oscar Swineford, in his own right and as executor, E. A. Swineford and Mary S. Danner also, answered, protesting against confirmation, and confirmation was refused, but the court there said that nothing which it had done should be construed as preventing a trust sale under the Sutton deed.

In May, 1926, Sutton, trustee, undertook to sell, and advertised the entire tract. The trust company induced him to offer first the 301 acres which Howard Swineford had retained. W. E. Purcell was the highest bidder at $12,600.00, but his offer was not quite sufficient to cover the debt and cost, and the trust company, rather than have the Marcia D. Swineford tract sold, offered to advance a few hundred dollars necessary to make up the deficit. Some controversy arose about a right of way. The trust company was willing to give this but Mr. Oscar Swineford refused and so that sale fell through, although a suit was brought to enforce it in which Mr. Purcell prevailed.

The trustee again offered this property for sale on May 9, 1927, after due advertisement. At that sale Mr. Gordon, representing the trust company, ex-

plained to the auctioneer that the debt sought to be collected was a Howard Swineford debt for which his wife was not personally liable and induced him to offer first the 301 acre tract which belonged to his estate. For it no bid was received. The property was then offered as a whole and was cried for about an hour, the highest bid being about $13,000.00. At the beginning of the sale Mr. Edward Swineford asked Mr. Gordon whether the trust company was not going to bid, and was told that it was not. After it had progressed for sometime, Mr. Swineford again approached Mr. Gordon and urged him to bid to protect his company. This Mr. Swineford denied but the weight of evidence is against him. The trust company did bid and offered $14,100.00. That was the last and highest bid and was accepted. Out of it the trust debt and costs of sale were paid, which left a balance of $405.78. This sale was not made upon any suggestion from the trust company. On the contrary, it, on more than one occasion, had induced the trustee to refrain from selling when he had contemplated such action.

Taking into consideration the advancements made by the trust company and the amount which it paid on account of its purchase, that corporation was out of pocket $26,412.25. The Denoons claimed from it $1,500.00 commissions on account of their sale to Jeffress and others, which, if paid, would increase the trust company's investment to $27,912.25.

The sale itself, as we have seen, was on May 9. The trust company did not attend that sale with any purpose to buy and did buy only when it became manifest that it stood to lose all that it had advanced, and when Mr. E. A. Swineford had urged it to buy to protect itself. Within a day or two after this sale was made Mr. Gordon told the Swinefords: "That we did not in-

tend to make a dollar profit out of it and that they could pay us what we had in it and they could take the property." Nothing was done at that time and on May 26, 1927, that company wrote to all of the Swinefords and renewed its offer, and promised to hold the matter open until June 10th. Again nothing was done. We are not dealing with a case in which the right to buy was made of the essence, and in which an offer to redeem came too late. The Swinefords did not offer to reimburse the trust company either on June 10th or later.

This then was the situation: The trust company found itself in possession of property which it had for the past four years been trying in vain to sell, although it had once received a valid offer of $30,000.00 net, only about $2,000.00 more than the company had invested or was liable for. It had no recourse against the Swinefords. The letter of September 3, 1924, limited their right to recover to the property itself and if it could not be recovered from that source it could not be recovered at all. Finally, on October 6, 1927, it sold it to J. W. Ferrell for $30,000.00. That is to say, it held this property from the 9th of May to the 6th of October, and finally sold it for the best price obtainable, $30,000.00. Measured by results of previous efforts to sell the margin of safety was small, for during the five months intervening between the purchase and sale interest was accruing at the rate of nearly $150 a month. Advancements for every conceivable purpose had been made, although the trust company was under no obligations to make them. They were made at the instance of the Swinefords and for their protection. More was done than could in reason have been expected, and yet it is said that this fiduciary should have protect-

ed its *cestuis que trustent*. It did not make the sale and it could not have prevented it. Certainly it was not called upon to pay the trust debt. If any such obligation rest upon an executor, his office is fraught with peril.

We are not dealing with a case in which a fiduciary is purchasing from himself or is purchasing property under his control, and we are not dealing with a case in which he is purchasing from his ward. Suppose the trust company had not bought at all. It would have lost $12,000.00 or $13,000.00, and if it had not been able to sell for $27,912.25 it would have lost the difference, and this loss, until sale was made, was, by reason of interest on the investment, rapidly increasing.

Two errors are assigned. It is said that the trial court erred in holding that the trust company acquired full and complete title under its purchase of May 9, 1927, free from any trust or duty to the complainants; and, second, in not setting aside a sale subsequently made by it to Denoon and others. If the first assignment is not well taken the second, of course, falls with it.

The trust company and Oscar Swineford were joint executors under the will of Howard Swineford, and the trust company was sole executor under the will of his wife. It was also trustee for Mrs. Swineford under the deed of May 14, 1923. No sales were made under that deed and this trust died with her.

Such disability as attaches to the trust company must attach because of its executorial character, although this does not lessen limitations placed upon its dealings. The relationship is, after all, one of trust.

The rule relied upon by appellants is thus stated in 26 R. C. L. page 1325: "Nothing in the law of fiduciary trusts is better settled than that the trustee

shall not be allowed to advantage himself in dealings with the trust estate. He shall not be allowed to serve himself under the pretense of serving his *cestui que trust*. The most usual way in which evasions of this salutary rule are attempted is in purchases of the trust estate by or in the interest of the trustee. That such purchasers shall not be allowed the realization of their purpose is the universal holding of the courts, except with the express consent or under a special permission given by a court of competent jurisdiction. This wise and salutary rule, designed to protect the weak and powerful, is founded upon two principles. The one is, that the trustee has no right to derive any benefit or advantage from the trust fund; but all his skill and labor in the management of it must be directed to the advancement of the interest of his *cestui que trust*, and the other is that a trustee will not be permitted to create in himself an interest opposite to that of the party for whom he acts."

With this rule we are in cordial accord, and we entertain no purpose to whittle it away, but in its application, as in the application of all rules, the facts to which it is to be applied must be remembered.

Plaintiff cites and relies upon the following Virginia cases: *Moore* v. *Hilton*, 12 Leigh (39 Va.) 1; *Bailey's Adm'x* v. *Robinsons*, 1 Gratt. (42 Va.) 4, 42 Am. Dec. 540; *Barksdale* v. *Finney*, 14 Gratt. (55 Va.) 338; *Washington, Alex. & Georgetown R. R. Co.* v. *Alexandria & Wash. R. R. Co.* 19 Gratt. (60 Va.) 592, 100 Am. Dec. 710; *Harrison* v. *Manson*, 95 Va. 593, 29 S. E. 420; *Smith* v. *Miller*, 98 Va. 535, 37 S. E. 10; *Bowles* v. *Bowles*, 141 Va. 35, 126 S. E. 49. An examination of them will show that they deal with sales in which the fiduciary purchased from himself, and it is perfectly

plain that when this is done the transaction should be set aside at the instance of any interested ward.

In *Staples, et als.* v. *Staples, et als.* 24 Gratt. (65 Va.) 225, 236, it appears that a purchaser at an executorial sale afterwards resold to the executor. Collusion was charged but the transaction was upheld and it has little bearing here.

In *Morgan, et als.* v. *Fisher's Adm'r*, 82 V̇a. 417, a widow who held a life estate, coupled with a power of appointment, and who was also executrix, paid a debt of her decedent and in doing so gave her bond signed by herself as executrix. The debt paid was a vendor's lien debt and she took a deed to herself. The court was of opinion that she had acted as executrix throughout the transaction and that the purchase inured to the benefit of the estate. She made use of her executorial status to effect the purchase and that was sufficient to impress it with a trust.

In *Bowles* v. *Bowles*, 141 Va. 35, 126 S. E. 49, 50, the court said: "A trustee has no right to purchase the property he is selling since he cannot occupy the position of seller and buyer at the same time. Such sale, even though the price be fair and adequate and the trustee's motive pure, will be set aside upon the application of the proper party. *Harrison* v. *Manson*, 95 Va. 593, 29 S. E. 420; *Smith* v. *Miller*, 98 Va. 541, 37 S. E. 10.

"No person can be permitted to purchase an interest where he has a duty to perform which is inconsistent with the character of purchaser. A trustee cannot purchase the whole of the trust subject from the beneficiary. The transaction in such cases is not void but voidable, and voidable only at the election of the *cestui que trust*, who alone has the privilege of annulling

the transaction, since he alone was injured, if there was a breach of trust. *Bresee* v. *Bradfield*, 99 Va. 340, 341, 38 S. E. 196."

In that case James Bowles qualified as administrator of his brother and in a damage suit growing out of his death recovered judgment for $3,000.00. The money went to Edmund Bowles, the father, who made a contract with James, the son, in which he assigned to James his interest in the judgment for a valuable consideration.

The court further said: "In the instant case, treating the agreement of December 1, 1904, as a purchase of the trust estate, rather than the settlement *in pais* by the administrator, Edmund Bowles was the *cestui que trust* and the administrator his trustee. So treating it, Edmund Bowles, on account of that relation, could have had that agreement cancelled, but his heirs at law are not entitled to any such privilege, certainly not after the lapse of fourteen years after the death of Edmund Bowles. * * *

"After so long a lapse of time, having by delay deprived the administrator of the testimony of four of his brothers and sisters, and Mrs. Duke, a white friend, all of whom had died in the meantime, to refute the charge of mental incompetency of Edmund Bowles, and the charge that he was defrauded by the agreement of December 1, 1904, the burden is upon the complainants to establish these charges by 'clear and convincing testimony.' "

That is to say, the court here held that a trustee might make a contract with his *cestui que trust* which would be upheld in the absence of fraud and that one who charged fraud must prove it.

So likewise, a contract was upheld in *Broaddus* v. *Broaddus*, 144 Va. 727, 130 S. E. 794, 800. There the

court said: "Counsel for appellees, it is true, urge upon the court that their relations and the circumstances put them in a condition of inferiority and inequality which amounted to actual fraud. The evidence does not disclose any such condition. The heirs were men and women of mature years, in physical and mental health, which the temptation to receive their legacies at once could not have disturbed. Besides the three men, two of whom were heirs and the other the husband of an heir, actually engaged in business, and had business experience sufficient to make them independent of guardianship."

Here, as in that case, these beneficiaries, grown men and women, by their letter of September 3, 1924, pledged their interest in these lands to secure such advancements as might appear to be necessary to advance their interests. It was a valid contract and they must stand to it.

So much for Virginia cases.

In 26 R. C. L. page 1337, it is said: "The principle that a trustee may purchase the trust property at a judicial sale brought about by a third party, which he had taken no part in procuring and over which he could not have had control, is upheld by numerous decisions of the United States Supreme Court, and other courts of this country. In support of this exception to the general rule it is said that in sales of trust property ordered by the court and conducted by its officers, there is no necessary conflict of interest in the mind of the trustee, such as would exist if he were both vendor and vendee, but on the contrary, sometimes the trustee himself may have an individual interest in the property which would make it his duty to become the purchaser to prevent sacrifice. And so where a judicial sale was in open market, and as one of the devisees the trustee

had considerable interest in the property and there was no chilling, no combination or conspiracy, and he gave the highest price the property would bring, it was held that the sale was valid and the title would pass thereunder. On the other hand, there are many well considered cases which apply the rule against allowing a trustee to purchase trust property as strictly in the case of a judicial sale as in that of a private sale."

It is true that this sale was not made under order of court, but it is likewise true that it was not a private sale made by the executors. It was made by a trustee who was a stranger to the trust company. As we have seen that company did not instigate it and it could not have prevented it.

*Allen* v. *Gillette*, 127 U. S. 589, 8 S. Ct. 1331, 1334, 32 L. Ed. 271, is quite in point. It there appears that James Morgan died owning certain lands. Gillette and Ball qualified as his executors. Mrs. H. A. Allen, a grandchild and devisee, borrowed money and secured it by a trust deed on her interest in her grandfather's estate. That deed was foreclosed. Gillette bought the property and a suit was brought to set aside the sale to him. The court, during the course of its opinion, said:

"There is nothing in the transaction, from its inception to its final consummation, that imposed upon the defendant any duty incompatible with his right as a purchaser at the sale.

"The principle that a trustee may purchase the trust property at a judicial sale brought about by a third party, which he had taken no part in procuring, and over which he could not have had control, is upheld by numerous decisions of this court and of other courts of this country. *Prevost* v. *Gratz* [Fed. Cas. No. 11,406], 1 Pet. C. C. 364, 378; *Twin-Lick Oil Co.* v. *Marbury*,

91 U. S. 587 [23 L. Ed. 328]; *Chorpenning's Appeal,* 32 Penn. St. 315 [72 Am. Dec. 789]; *Fisk* v. *Sarber,* 6 Watts and S. [Pa.] 18.

"It is true that the rule upon this subject as stated by some text writers is more stringent than that stated in these cases. 1 Perry on Trusts, section 205; Hill on Trustees, 250. We think, however, that the language employed by them does not present a thorough and perfect generalization of the essential principles pervading the decisions upon this subject. They are in manifest conflict with the uniform current of decisions of the Supreme Court of Texas, which are our guides in this case. *Erskine* v. *De la Baum,* 3 Texas, 406, 417 [49 Am. Dec. 751]; *Howard* v. *Davis,* 6 Texas, 174; *Scott* v. *Mann,* 33 Texas, 725; *Goodgame* v. *Rushing,* 35 Texas, 722."

It is true that in this case the trust deed was executed after the testator's death, but the executor was no more a stranger to that transaction than he was to one executed by the testator himself. It was powerless to control in either case the action of the trustee.

*Chorpenning's Appeal,* 32 Penn. St. 315, 72 Am. Dec. 789, is a case in which it appears that Chorpenning died seized of certain lands and Henry Chorpenning was appointed guardian for his three minor children. This land was sold by the sheriff under a judgment against the administrators in favor of Martin Phillipi and was bought by the guardian. A suit was brought to set aside that purchase. The court said:

"The doctrine that a party will not be allowed to purchase and hold property for his own use and benefit, when he stands in a fiduciary relation to it, if contested by the party entitled as *cestui que trust,* is indisputable. And the rule is inflexible, without regard to the consideration paid or the honesty of intent. Public policy

requires this, not only as a shield to the parties represented, but as a guard against temptation on the part of the representative. The relation, however, must be one in which knowledge, by reason of the confidence reposed, might be acquired, or power exists to affect injuriously the interests of *cestui que trust*, or advance that of the trustee. The reason of the law is its life, and unless some advantage might be gained by reason of the relation, the principle does not apply. The doctrine on this subject was elaborately discussed by this court in the case of *Beeson* v. *Beeson*, 9 Pa. St. 279, and held as stated above and in many cases before and since.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"It may be conceded that he stood very near the line of disability as a purchaser for his own interest, but still outside of it, if the reason of the law is to govern. Authority, however, sustains his position. In *Prevost* v. *Gratz* [Fed. Cas. No. 11, 406], Pet. C. C. 378, it was said, per Washington, J.: 'I know of no principle of equity, however, which will invalidate the title of a trustee to land which the law has taken out of its hands, and which he purchased from one appointed by the same authority to sell it.' "

In *Froneberger* v. *Lewis*, 79 N. C. 426, the court said: 'There are a class of cases which have to be distinguished from the general rule as follows: Wherever the trustee has a personal interest in the trust property, there, of course, he must have the right to protect it, and if to bid for and buy it be necessary to protect it, he must be allowed to do it for that purpose."

It may be conceded that $14,100.00 was not a fair price for the land, but $14,100.00 plus advancements or $27,912.25, which was in substance what the trust company paid, was, if we measure its value by the ineffectual efforts to sell which had continued for four

years and by the prices which during that period had been suggested as adequate. It is true that since then, due to industrial developments in that vicinity, values have materially increased, but we must look to them as of the date of sale and it is interesting in this connection to note that the property was actually sold five months after purchase at an advance of very little over $2,000.00. Had values fallen away the trust company stood to lose. The estate was without funds. It did give to these devisees one month in which to redeem, but, as we have seen, neither then nor later did they offer to do so. To require the executor to continue to hold this land as a trust to await some speculative rise in values would have been to put it in a position of having everything to lose and nothing to gain, and the right given to look to it for reimbursements on advances made over a four year period would have been no right at all. Complaint is not really made because the trust company bought. Had it not done so the land would have gone to some stranger for a lesser sum. It had in substance a contract right to buy, and with this right to buy went the right to sell. It is this right which is challenged. Where sales have been set aside the reason therefor was because there was no power to purchase, because the purchase itself was a breach of trust, and that is not this case.

It is not possible within reasonable limits to analyze all of the cases relied upon by appellants and so we must, perforce, consider only some of those stressed in argument.

In *Martin* v. *Wyncoop*, 12 Ind. 266, 74 Am. Dec. 209, the following facts appear: Morris was the administrator of Pierce. Pierce was the owner of certain lands, and Morris held a judgment against him on which execution had issued. Pierce died, but a writ of

*venditioni exponas* issued under which this land was finally sold and Morris became the purchaser. It does not appear that Morris's debt would have been lost had he failed to buy, but it does not appear that there was any contract between him and the heirs under which he was given any lien for advancement made at their request.

In *Campbell* v. *Johnston*, 1 Sandf. Ch. (N. Y.) 148, it appears that a testator appointed two persons as his executors and as guardians for his infant children, and devised his estate to them in trust to be sold for their benefit. Land belonging to decedent was subject to mortgages given by him and under one of them was sold. One of the executors purchased it. Here the purchase was plainly not for the protection of the purchaser.

In *Rogers* v. *Rogers*, 1 Hopk. Ch. (N. Y.) 515, Halsey Rogers was the executor of Thomas Rogers and was his creditor by judgment. The personal estate of the decedent was not sufficient to pay his debts and "it was necessary that the lands, or some of them, should be sold for the satisfaction of creditors." The court said that in such circumstances it was the executor's duty under the New York statute to apply to the surrogate for an order to sell. We have no such statute in Virginia.

*Marshall* v. *Carson*, 38 N. J. Eq. 250, 48 Am. Rep. 319, is also relied upon. There Marshall died testate owning real estate covered by mortgages and judgments. His executors were directed to sell so much of his land as was necessary to pay his debts. The executors did not sell but the sheriff did and the executors bought. It does not appear that it was necessary for them to do this in order to protect themselves.

In *Jewett* v. *Miller*, 10 N. Y. 402, 61 Am. Dec. 751, it

appears that Miller was receiver for the Wayne County Bank and as such foreclosed the mortgage for that bank and purchased the land. It was not necessary for Miller to do this in order to protect himself.

In *Michoud* v. *Girod*, 4 How. 503, 11 L. Ed. 1076, the executors who purchased were not forced to do so in order to protect themselves.

■■ The limitations imposed upon fiduciaries in transactions of this character are stressed in *U. S.* v. *Carter*, 217 U. S. 286, 30 S. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594; *Magruder* v. *Drury*, 235 U. S. 106, 35 S. Ct. 77, 59 L. Ed. 151, and in many other cases, and in their discussion there are many general statements which support appellants' contention. Certainly a trustee cannot buy from himself, or at his own sale, and many cases hold that he cannot ordinarily purchase property of his *cestui que trust*, even when the sale is made by a stranger; but cases stand upon their facts, and we know of none which holds that an executor cannot buy at a sale not brought about by himself and made by a trustee to whom he is a stranger, when it is necessary for him to do so to protect himself under a contract given him by the beneficiaries, when that contract is for their benefit, eminently fair, and made by parties wholly competent. That these beneficiaries had power to make such a contract cannot be questioned under our decisions.

It is said that the trustees did not make *ex parte* settlement as required by statute. Code, sections 5408, 5423, 5426, 5427, 5428, and 5429.

Mr. Watt testified as follows: "I might say that the account of the executors of the Howard Swineford estate for the year ending on May 2, 1924, which was the first year of our administration, was sent to Mr. Pool with a letter from this company under date of

May 8, 1924. Under date of May 6, 1925, we sent to Mr. Pool an account as executors of Howard Swineford's estate for the year ended May 2, 1925. Under date of May 7, 1926, we sent to him an account for the year ended May 2, 1926. On May 5, 1927, we sent him an account as executor for Howard Swineford's estate for the year ended May 2, 1927. I will say here that the account for the year ended May 2, 1928, has not yet been filed, it having been held up by us for the reason that we had hoped to be able to show in that account a credit representing an excess which might arise from the purchase and sale of the property by the Virginia Trust Company, but an adjustment of the books on this account has been deferred temporarily, but the proper account will be made in due time."

Counsel for plaintiff said: "No objection is made on that ground. I am not questioning that he sent them to the commissioner."

We think in these circumstances that the executor should not be penalized for any possible failure of the commissioner of accounts to act.

If the trust company had the right to buy, it had the right to sell, and so there is no occasion to discuss the second assignment of error.

The equities are plainly with the defendants, and for reasons stated we hold that the decree appealed from must be affirmed.

*Affirmed.*