WACHOVIA BANK AND TRUST COMPANY, TRUSTEE UNDER THE LAST WILL
AND TESTAMENT OF LEILA JOHNSTON WADDELL, v. ROBERT BRUCE
JOHNSTON; ROBERT BRUCE JOHNSTON, JR., KATHRYN ELIZA-
BETH JOHNSTON, BARBARA FORBES JOHNSTON AND WILLIAM
EUGENE JOHNSTON, MINOR CHILDREN OF ROBERT BRUCE JOHN-
STON; ALL UNBORN CHILDREN OF ROBERT BRUCE JOHNSTON; AND
KINGSLAND VAN WINKLE, CHARLES E. WADDELL, JUNIUS G.
ADAMS, JR., EDWARD L. KEMPER, BRUCE SILVIS, AND RT. REV.
M. GEORGE HENRY, AS TRUSTEES OF THE DIOCESE OF WESTERN NORTH
CAROLINA OF THE PROTESTANT EPISCOPAL CHURCH OF THE UNITED STATES
OF AMERICA AND KATHRYN K. JOHNSTON, GUARDIAN AD LITEM OF
ROBERT BRUCE JOHNSTON, JR., KATHRYN ELIZABETH JOHN-
STON, BARBARA FORBES JOHNSTON AND WILLIAM EUGENE
JOHNSTON.

(Filed 29 March, 1967.)

1. **Trusts § 4—**

Even when the trust instrument does not authorize the trustee to sell
for reinvestment, a court of equity, in the exercise of its inherent super-
visory jurisdiction over trusts, may order a sale for such purpose, and
G.S. 41-11 is not applicable thereto, but the court will do so only when
change of conditions and exigencies not anticipated by testatrix make a
sale for reinvestment necessary to preserve the purpose of the trust and
effectuate the intent of testatrix.

2. **Same— Evidence held sufficient to support order of sale of trust
property to effectuate intent of testatrix.**

The evidence tended to show that the trust *res* was an old building,
that rentals therefrom were decreasing and would likely continue to de-
crease and were insufficient to provide needed repairs, that the area had
changed and had been denominated a "blighted" area, that the price
offered was in excess of the highest appraised value of the property, that
the reinvestment of proceeds of sale would increase the income of the life
beneficiary and would enhance the value of the *corpus* for the benefit of
the contingent remaindermen, and that the change in conditions amounted
to an exigency not foreseen by testatrix. *Held:* The evidence supports
order of sale for reinvestment to preserve the trust and carry out the
purposes and intent of testatrix.

3. **Same—**

The rule that a trustee may not purchase the trust property at its own
sale is fundamental and strengthened by statute in this State, G.S. 36-28,
and the rule is subject to exception only in extraordinary cases in which
a court of equity approves such sale after a full and fair disclosure of all
the facts in a proceeding in which all parties are represented and it is
made to appear that the sale would materially promote the best interests
of the trust and its beneficiaries, and that there are no other purchasers
willing to pay the same or a greater price than that proffered by the
trustee. G.S. 36-42.

4. **Same— Order of sale to trustee may not be entered until after pub-
lic advertisement fails to disclose prospect of equally advantageous sale.**

The evidence in this proceeding supported the order of the court that
the trust *res* be sold for reinvestment, that the property was peculiarly
valuable to the trustee, that the trustee had offered a price greater than
the best valuation placed on the property, and that the sale to the trustee

would promote the best interests of the trust and its beneficiaries, but there was no evidence that there had been any advertisement to the public that the property was for sale or that the trustee had affirmatively sought other prospective purchasers. *Held:* The order approving sale to the trustee must be vacated and the cause remanded to the end that the trustee take appropriate action in endeavoring to find the most advantageous purchaser and in advertising the property for sale in order to support a finding by the court that no other equally advantageous prospect for sale of the property exists or is reasonably anticipated.

5. **Same—**

In those instances in which sale of the trust *res* to the trustee may be properly approved, the trustee may not receive commissions for receipt or collection of the purchase price, may not reserve prepayment privileges after the initial payment upon the purchase price, must file and obtain approval of annual accounts for the trust, must execute a first mortgage or otherwise secure the balance of the purchase price after the initial payment, must give adequate bond as required by G.S. 1-407, and must invest the proceeds of sale in real or personal property subject to the rules and laws respecting investments by trustees, all subject to order and approval of a court of equity.

APPEAL by defendants, minor remaindermen, from *Martin, S.J.,* 3 January 1967 Civil Session of BUNCOMBE.

Civil action by testamentary trustee for authority to sell real property and reinvest proceeds.

Leila Johnston Waddell died testate in 1924, leaving approximately $350,538.65 in personal property and real estate consisting of the Paragon Building in the City of Asheville. All her personal estate, except bequests amounting to $32,000, went to her husband, D. C. Waddell. Item Seven of the will provided that upon the death of her husband, the Paragon Building should go to Wachovia Bank & Trust Company as trustee, and directed the trustee to pay the net income received by it from the building to William Johnston and Robert Bruce Johnston, providing that if either William Johnston or Robert Bruce Johnston should die without issue, the income would be paid to the survivor. Upon death of the survivor, the property should be delivered to his children, *per stirpes.* In the event neither of the Johnstons left children surviving him, the trustee was directed to turn the property over to the Diocese of Western North Carolina of the Protestant Episcopal Church of the United States of America.

The will authorized the trustee to make such improvements and repairs as would produce the most income and further authorized the trustee to borrow and mortgage the property for these purposes; provided, the trustee must set up a sinking fund to repay the loan, which fund must not exceed ten percent of the net income. The percentage was increased from ten percent to twenty-five percent

by subsequent order of court. The trustee was given no power to sell the trust property.

D. C. Waddell, husband of testatrix, died in 1950. He was predeceased by William Johnston.

Since it became trustee, Wachovia Bank & Trust Company has paid and continues to pay income to Robert Bruce Johnston, who is married to Kathryn K. Johnston. Robert Bruce Johnston is the father of four minor children: Robert Bruce Johnston, Jr., Kathryn Elizabeth Johnston, Barbara Forbes Johnston, and William Eugene Johnston.

The Paragon Building is a 65-year old, 3-story frame and brick building with a full basement, and covers the entire land described in the will. The lot on which the building is located fronts 29 feet on Patton Avenue, 137.8 feet on Haywood Street, and 62 feet on College Street, all of these streets being major downtown business streets in the City of Asheville. The building is located a block from the nearest parking facility and is in a downtown area which has been certified as "blighted" by the Asheville City Planning and Zoning Commission. The report included the Paragon Building in a list of downtown buildings designated by the Commission as "dilapidated." The building proper is trapezoid in shape, has no elevator, and at the present time is in need of roof repairs at an estimated cost of $4,500. The building has a total of 5143 square feet available for rent or lease on the first floor, which is occupied by five retail businesses. Two of the first floor leases expire in 1967 and the other three expire in 1969. The second floor of the building has 4813 square feet available for office space rental, and is occupied by three tenants who rent 30% of the available space. The third floor has 5383 square feet, but is without water, heat or electricity, and is used only for storage by other tenants. Three of the second floor tenants moved out in 1965, and the remaining two tenants rent on a month-to-month basis. The following is a schedule of gross and net rental income for the period 1956-1966:

| Year | Gross Rentals | Net Rentals |
| --- | --- | --- |
| 1956 | $37,370.34 | $16,198.24 |
| 1957 | 40,178.71 | 13,561.92 |
| 1958 | 37,529.37 | 17,445.63 |
| 1959 | 38,236.92 | 20,361.92 |
| 1960 | 40,136.63 | 19,547.62 |
| 1961 | 38,713.57 | 20,695.12 |
| 1962 | 38,313.54 | 20,398.45 |
| 1963 | 38,448.85 | 20,937.06 |
| 1964 | 39,389.77 | 21,336.37 |
| 1965 | 43,298.02 | 19,476.66 |
| 1966 | 34,064.19 | 18,428.03 |

There was evidence showing that the real estate values in the downtown area were affected because many retailers have moved to suburban shopping centers.

Two new office buildings were completed in the downtown area of Asheville in 1965. One of these, The First Union National Bank Building, has twenty-five percent, or 5400 square feet, of its rental office space still unoccupied. The other, Northwestern National Bank Building, has thirty percent, or 45,000 square feet, of its rental office space still unoccupied.

Affidavits of two vice presidents of the plaintiff bank were introduced in evidence, which are in pertinent part quoted below:

John W. Spicer, Senior Vice President: "(I)n the opinion of this deponent such a sale would be to the best interests of the trust, the lifetime beneficiary thereof and the remaindermen, in that the only possible use of the premises in their present condition is for rental to small retail stores. That the lot in question is not sufficiently large to enable a new building to be erected thereon without combining the same with additional property, and that under these circumstances it will be impossible to carry out the intentions of Leila Johnston Waddell in establishing the trust to provide for satisfactory income to the life tenant and principal to the remaindermen. . . ."

Robert L. Montague, Vice President: "That, in the opinion of this deponent, with the increasing costs for maintenance occasioned by reason of the age of the building, the fact that sales in the retail stores are on an apparent decline, it would appear that rentals will decrease, expenses will further increase, and the net return to the building will be less in the future — which in turn, when affected by any inflationary trend in the general economic situation, will result in a hardship to the lifetime beneficiary and the remaindermen of the Leila Johnston Waddell trust."

An appraisal of the property was made by a qualified real estate appraiser, who estimated the value of the property to be $315,000 as of the year 1965. There was also evidence that the value of the building and land would decline because of the size and shape of the lot, the age of the building, and because of the availability of new and more modern office space.

The plaintiff in this action prays that Wachovia Bank & Trust Company as trustee be permitted to sell the property to Wachovia Bank & Trust Company for the sum of $450,000, $130,500 to be paid at closing of transaction, and the balance in thirty semi-annual equal installments, each payment to be applied first to the interest on unpaid balance at the rate of 6% per annum, and the balance to unpaid principal; further, that it be granted power to

invest and reinvest the principal proceeds of the sale in common stock, equities and bonds.

The life beneficiary, Robert Bruce Johnston, filed an answer admitting the allegations of the complaint, joined in the prayer for relief, and further alleged that the plaintiff had notified him that it was interested in purchasing the Paragon Building property for the purpose of adding this property to land already owned by the Bank so that it might erect a modern bank building in this area, and that, being sensitive to its fiduciary duties to the defendants, plaintiff proposed to defendant that it should resign as trustee in order that no question might arise as to conflict of interests, but that the answering defendant informed the plaintiff that he wanted it to continue to act as such trustee.

This matter came on to be heard before Judge Harry C. Martin, and he found, *inter alia,* the following facts:

"24. Wachovia Bank and Trust Company's Common Trust Fund, which is a balanced type fund with an objective of stable income and safety of principal through diversification of investments, and made up of sixty percent stock equities and forty percent bonds, shows an average annual yield over the twenty-four year period (1942-1965) of 3.725 percent. If the trend over this twenty-four year period continues, and using a conservative yield of 3.5 percent on the principal as paid in under the terms of the proposed sale and purchase of the trust property, coupled with the interest payments, of the secured note, the average income to the life beneficiary Robert Bruce Johnston over the next fifteen years if invested in said fund, will be in excess of $20,000 yearly. The actual experience of the aforesaid Common Trust Fund shows an annual increase in earnings of 3.2 percent. Should this experience continue, it will increase the earnings on the investment.

"25. The total principal paid the trust for the Paragon property less the tax on same would total $419,211.58. This figure does not include any gain or loss in value of the equities over the fifteen year period. The Wachovia Bank Common Trust Fund shows an average annual appreciation of unit value for the years 1941 through 1965 of 4.2 percent. Should this average annual appreciation continue, the *corpus* of the trust would total $589,300 at the end of the fifteen year period. The remaindermen would have the $419,211.58, plus or minus any change in value, available when the trust ends at the life beneficiary's death.

"26. As of the present date no offer to purchase the Paragon property, other than that of the plaintiff, has been made to

the trustees, and they have not been approached by anyone towards negotiation for such purchase."

The judge also entered and made the following conclusions of law in the judgment:

"1. That the Trustee be, and it is hereby granted, the power of sale of the real estate and building known as the Paragon Building, the asset of the trust.

"2. The Trustee is relieved from the provisions of G.S. 36-28 with respect to the sale hereby authorized.

"3. A private sale of the real property asset of the trustee is hereby authorized to Wachovia Bank and Trust Company upon the terms and conditions set forth in the findings of fact.

"4. The Trustee is authorized to invest the proceeds of the sale of the real estate, as herein authorized, in personal property, including stocks and bonds, subject to the usual rules and laws respecting trustees and investments by trustees."

From the judgment entered on 12 January 1967, the minor defendants gave notice of appeal.

*Van Winkle, Walton, Buck and Wall for plaintiff appellee.*

*Harold K. Bennett and Robert Bobo Long, Jr., for defendant appellants.*

BRANCH, J. The appellants present these questions:

I. Did the trial court err in holding that there is sufficient evidence of the existence of an emergency, contingency or exigency which threatens to frustrate the purposes of the testamentary trust of Leila Johnston Waddell and which necessitates a sale of the trust *res?*

II. Did the trial court err in finding that there is sufficient evidence that the proposed sale will materially enhance the interests of all possible beneficiaries of the trust?

III. Did the trial court err in holding that there is sufficient evidence that the testatrix would have provided for the sale of the trust *res* had she foreseen the present circumstances and would have allowed reinvestment of proceeds in personal property?

IV. Did the trial court err in holding that there is sufficient evidence that no other prospects for sale of the trust property other than the sale for which this action was instituted now exists or is reasonably anticipated?

## I.

The primary purpose of the trust was to provide income for certain life tenants and then to deliver the trust property in fee to children of certain of the life beneficiaries. To that end, the trust instrument gave the trustee power to borrow money and to mortgage the trust property. It was further provided that only a limited amount of the yearly income could be used to repay loans, which could have resulted in the property passing to the remaindermen encumbered with a long-term lien. Considering the fact that the life beneficiaries were known and loved by the testatrix, we conclude that the primary purpose of the trust was to provide income for the life beneficiaries. However, considering the rights of both the surviving life beneficiary and the apparent remaindermen, the minor children, we are confronted with the question whether such emergency, contingency or exigency exists which threatens to frustrate the purposes of the trust unless the trust *res* is sold.

At the outset we recognize the distinction between this action and an action brought under G.S. 41-11, which authorizes a sale for the purpose of reinvestment or improvement when instituted *by holders of a vested interest in the land.* The instant action is by a trustee seeking to invoke the inherent equitable jurisdiction of the court over a trust estate. *Trust Co. v. Rasberry,* 226 N.C. 586, 39 S.E. 2d 601. Therefore, the same statutory rules and limitations do not necessarily apply here as in cases brought under G.S. 41-11. Rather, in the exercise of its general, inherent, exclusive supervisory power over trusts, the court may authorize whatever is necessary to preserve and protect the trust estate, and in cases of emergency the court may authorize and direct the trustee to do acts which under the terms of the trust agreement and under ordinary circumstances the trustee would have no power to do. The prime consideration is the necessity for the preservation of the estate. *Trust Co. v. Rasberry, supra.*

*Carter v. Kempton,* 233 N.C. 1, 62 S.E. 2d 713, is a landmark case in North Carolina, wherein approval of a family settlement was sought to remove a proportionate part of the estate from the trust because dissension between distributee and trustees threatened to cause a family misunderstanding. The Court refused to approve the settlement and, speaking through Barnhill, J., (later C.J.), in part said:

> "(2) . . . A court of equity looks with a jealous eye on a contract that materially affects the rights of infants. Their welfare is the guiding star in determining its reasonableness and validity.

"(3). A court of equity will not modify or permit the modification of a trust on technical objections merely because its terms are objectionable to interested parties, or their welfare will be served thereby. It must be made to appear that some exigency, contingency, or emergency has arisen which makes the action of the court indispensable to the preservation of the trust and the protection of infants.

"(4). To invoke the jurisdiction of a court of equity the condition or emergency asserted must be one not contemplated by the testator and which, had it been anticipated, would undoubtedly have been provided for; and in affording relief against such exigency or emergency, the court must, as far as possible, place itself in the position of the testator and do with the trust estate what the testator would have done had he anticipated the emergency. . . . It is not the province of the courts to substitute their judgment or the wishes of the beneficiaries for the judgment and wishes of the testator. The controlling objective is to preserve the trust and effectuate the primary purpose of the testator. . . .

"(5). The exigency, contingency, or emergency necessary to invite the intervention of the courts must relate to and grow out of the trust itself or directly affect the *corpus* thereof or the income therefrom."

The law as stated by this Court is generally recognized in other jurisdictions, as evidenced by statements contained in Bogert on Trusts, 4th Ed. § 146, p. 375, to wit:

"Sometimes a settlor gives instructions in the trust instrument with regard to the administration of the trust which turn out to be highly disadvantageous and obstruct the trustee in carrying out the purposes which the settlor expressed. These difficulties are usually due to a change in conditions regarding the trust property or parties which have occurred since the trust was established and were not anticipated by the trustor. . . .

"If the settlor or a trustee or beneficiary can prove to the court that such a situation exists, the court has power to allow the trustee to deviate from the administrative provisions laid down by the settlor, to ignore them, and to employ other methods in carrying out the trust. The clauses of the instrument relating to the benefits to be conferred on the beneficiaries are primary and fundamental and are the principal concern of the court. The terms regarding methods and means of achieving these results are of secondary importance and equity will

not permit them to interfere with the efforts of the trustee to bring to the beneficiaries the intended benefits. . . ."

The power of the court to alter private trusts was considered by this Court in *Trust Co. v. Nicholson,* 162 N.C. 257, 78 S.E. 152, where the Court held, *inter alia:*

" 'We think it is well settled that a court of equity, if it has jurisdiction in a given cause, cannot be deemed lacking in power to order the sale of real estate which is the subject of a trust, on the ground, alone, that the limitations of the instrument creating the trust expressly deny the power of alienation. It is true, the exercise of that power can only be justified by some exigency which makes the action of the court, in a sense, indispensable to the preservation of the interests of the parties in the subject-matter of the trust, or, possibly, in case of some other necessity of the most urgent character. . . .' "

The evidence is undisputed that (1) there was a 25% decrease in gross rentals from 1965 to 1966, (2) the building on the property is 65 years old and in need of roof repairs, (3) the third floor is without electricity, water or heat, and is used only for storage by current tenants, (4) several of the tenants of long standing on the second floor moved to more modern quarters in 1965, (5) the lot is not adaptable for a modern building without additional land, (6) in the opinion of several of plaintiff's employees the rental income will gradually decrease, (7) the trust does not have sufficient income to adequately modernize the building, (8) modern office space is now available in the area, (9) the area in which the building is located has been certified a "blighted" area and the building considered as "dilapidated" by the Asheville-Buncombe Planning Board, and (10) the area in which the building is located has inadequate parking space.

These and other findings of fact by the court show changed conditions and the existence of an exigency or emergency, threatening to frustrate the purpose of the trust, and necessitating the sale of the trust *res.*

## II.

Whether there be sufficient evidence to find that the proposed sale will materially enhance the interest of all possible beneficiaries has been answered, in the main, by our discussion of appellants' first question. However, there is additional evidence that the price offered for the trust property exceeds the highest appraisal of the property by $83,000, and, under the terms of the proposed sale, the life tenant would receive income of at least $20,000 per year, and,

at the end of the 15-year proposed payment period, the *corpus* would amount to $419,211.58 in principal, after taxes, plus any increase in the value of the equities. Considering this with the evidence of existing emergency or exigency discussed above, we hold that there was plenary evidence to support the trial court's finding that the proposed sale would materially enhance the interest of all possible beneficiaries of the trust.

### III.

There is sufficient evidence to hold that the testatrix would have provided for the sale of the trust *res* and would have allowed the reinvestment of the proceeds in personal property had she foreseen the present circumstances. We do not believe that the testatrix could have foreseen the development of suburban shopping centers that offer modern office building space, nor could she have imagined the tremendous use of and dependence on the automobile by modern people, which in turn demands adequate parking facilities. She could not have foreseen the affluence of modern society which allows the ordinary business man renting office space to consider the elevator, central heat, air conditioning, nearby auto parking and functional beauty necessities rather than luxuries. She thus would not have known of the coming of tremendous office buildings which offer all of these luxuries in competition with the now outmoded trust *res*.

In the case of *In re Kenan*, 262 N.C. 627, 138 S.E. 2d 547, the Court approved the modifications of a trust where the settlor later became incompetent, and authorized the trustees to make certain specific gifts from the income and principal upon approval of the trial judge's finding of fact that the incompetent, if of sound mind, would probably have made the gifts in the manner proposed. The testatrix in the instant case was certainly not averse to investments in personal property. The record shows that at the time of her death she owned approximately $281,000 worth of stocks and bonds and only one piece of realty. It was testatrix' intent in creating the trust agreement to provide income for certain persons. It naturally follows that had testatrix known that the real property would no longer satisfy the purpose of the trust, she would have provided for the sale of the property and reinvestment in income-producing personal property.

Although not raised by either party, this record presents the serious question of the propriety and legality of the trustee purchasing trust property from itself.

One hundred and seventeen years ago this Court, in the case of *Brothers v. Brothers*, 42 N.C. 150, stated: "It is an inflexible rule,

that when a trustee buys at his own sale, even if he gives a fair price, the *cestui que trust* has his election to treat that sale as a nullity, not because *there is* but because there *may be* fraud."

In the case of *McNeill v. McNeill*, 223 N.C. 178, 25 S.E. 2d 615, the Court held: "The law is well settled that in certain known and definite 'fiduciary relations, if there be dealing between the parties, on the complaint of the party in the power of the other, the relation of itself and without other evidence, raises a presumption of fraud, as a matter of law, which annuls the act *unless such presumption be rebutted by proof that no fraud was committed, and no undue influence or moral duress exerted.'*" (Emphasis ours) Accord: *Willetts v. Willetts*, 254 N.C. 136, 118 S.E. 2d 548.

It is universally recognized that one of the most fundamental duties of the trustee throughout the trust relationship is to maintain complete loyalty to the interests of his *cestui que trust*. This concept was forcefully expressed in the case of *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, by Cardozo, C.J., as follows:

> "A ·trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions, . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

In this jurisdiction there have been few inroads on the rule regarding the duty of loyalty by the trustee to the interests of the *cestuis que trust*. The first apparent deviation in the rule appears in the case of *Bolton v. Harrison*, 250 N.C. 290, 108 S.E. 2d 666, where there was a foreclosure of a mortgage by action in which the executor and heirs were made parties. After settlement of the estate, the executors purchased at the sale which *was confirmed by the court*. After other foreclosures, *mesne* conveyances, and lapse of about twenty-eight years, the remaindermen under the original will sought to have a trust declared in their favor. They failed to allege or prove a defense to the action of foreclosure or introduce any evidence of fraud. The Court, holding that nonsuit was proper, said:

> " 'Without regard to the act of 1903, the court has the power to order the sale of real estate limited to a tenant for life, with

remainder to children or issue, upon failure thereof, over to persons, all or some of whom are not *in esse,* when one of the class being first in remainder after the expiration of the life estate is *in esse* and a party to the proceeding to represent the class, and that upon decree passed, and sale and title made pursuant thereto, the purchaser acquires a perfect title as against all persons *in esse* or *in posse.*' *Lumber Co. v. Herrington,* 183 N.C. 85, 110 S.E. 656.

"Necessarily, purchasers of property, especially land, must have faith in and place reliance on the validity of judicial proceedings."

The Court again considered the fiduciary relation in the case of *Miller v. Bank,* 234 N.C. 309, 67 S.E. 2d 362, wherein the bank sold stock which it held in trust for minor beneficiaries to a corporation having interlocking directorate with the bank. One of the minor beneficiaries sought to recover for loss alleged to have been sustained. Plaintiff set out in his complaint that a judgment of the superior court was rendered approving the sale of the shares of stock now complained of, the present plaintiff and all interested persons being parties to the proceeding. The Court stated:

"Plaintiff's allegation that the sale of the shares of stock complained of was approved by a judgment of the Superior Court in an adversary action in which the plaintiff here was party defendant and appeared by a guardian *ad litem* and answered, nothing else appearing, would raise a complete defense to his complaint on that ground, and his allegations of negligence and mismanagement in respect to the sale of this stock would not avail against a valid judgment rendered by a court having jurisdiction of the parties and of the subject matter."

Citing *Bolton v. Harrison, supra,* Moore, J., speaking for the Court in *Morehead v. Harris,* 262 N.C. 330, 137 S.E. 2d 174, said:

"If the sale is affirmatively sanctioned and ratified by the heirs or beneficiaries, it will be declared valid. *Gurganus v. McLawhorn,* 212 N.C. 397, 193 S.E. 844; *Froneberger v. Lewis, supra.* If property is sold at a judicial sale made pursuant to an action to foreclose a mortgage, in which action all interested persons are parties, the fiduciary may purchase with leave of court and obtain a good title if full value is paid and the transaction is free of fraud."

Other jurisdictions allow trustees to purchase trust property under certain circumstances. See *Anderson v. Butler,* 31 S.C. 194, where the Court held:

". . . It is a well established principle, that a trustee cannot buy at his own sale. He cannot be vendor and vendee at the same time of trust property; . . . (W)hile this doctrine obtains, and will be uniformly enforced when the trustee is both vendor and vendee, as said above, yet we fail to see its applicability to all judicial sales, where a trustee may happen to become the purchaser of the property sold. We see no reason why, in every such sale, the rigid doctrine above should be applied, and that a trustee should be precluded from purchasing the same as if he were the vendor. In sales ordered by the court of trust property, and conducted by the officers of the court, there is no necessary conflict of interests in the mind of the trustee, like that which would exist when he is both vendor and vendee."

The general rule was adhered to by the Virginia Court in *Swineford v. Trust Co.,* 154 Va. 751, with the addition of the following exception: "Such purchases are not allowed, except with the express consent or under special permission given by a court of competent jurisdiction."

The case of *Honeywell, et al, v. Dominick, et al,* ...... S.C. ..., 76 S.E. 2d 59, presented a question of the validity of conveyance to herself individually of property of an estate and trust by the executrix and trustee under her husband's will. The Court, in confirming the sale, said:

" 'It is a stern rule of equity that a trustee * * * cannot be both vendor and purchaser', *Imboden v. Hunter,* 23 Ark. 622, 79 Am. Dec. 116, but, without whittling the rule away, there may be justifiable exceptions under extraordinary facts which are found by a court of competent jurisdiction upon careful investigation and full representation of the *cestuis* or beneficiaries; and all of these conditions have been satisfactorily met in the case at bar. 'The rule against the purchase of trust property by the trustee will not apply, according to the holding of many cases, where, under the particular circumstances of the case, the reason for the rule does not exist, as, for example, where there is no possibility of advantage to the trustee or prejudice to the trust estate from the transaction in question.' 54 Am. Jur. 362, Trusts, sec. 456."

Bogert, Trusts and Trustees, 2d Ed., § 543, p. 476, states:

"In most cases it is unnecessary for the trustee to act in two capacities, in order to advance trust administration, and in permitting self-dealing to enter the trustee is gratuitously

exposing the beneficiaries to a risk. If peculiar circumstances make it necessary to allow the trustee to act for himself as well as for the beneficiaries with regard to a particular transaction, relief can be had by an application to the court."

Scott on Trusts, 2d Ed., Vol. II, § 170.7, p. 1209, states: "We have seen that a trustee cannot properly purchase trust property for himself individually, even though he acts in good faith and pays a fair consideration for it. The circumstances may be such, however, that it would be advantageous to the trust estate for the trustee to purchase the property."

The North Carolina General Assembly enacted Chapter 36, Article V, the Uniform Trust Act, in 1939. G.S. 36-28 is as follows:

"Trustee buying from or selling to self. — No trustee shall directly or indirectly buy or sell any property for the trust from or to itself or an affiliate; or from or to a director, officer, or employee of such trustee or of an affiliate; or from or to a relative, employer, partner, or other business associate."

The purpose of this section is to clarify and strengthen rules regarding loyalty by a trustee to the interests of his *cestuis que trust.*

G.S. 36-42, under Article V, is as follows:

"Power of the court. — A court of competent jurisdiction may, for cause shown and upon notice to the beneficiaries, relieve a trustee from any or all of the duties and restrictions which would otherwise be placed upon him by this article, or wholly or partly excuse a trustee who has acted honestly and reasonably from liability for violations of the provisions of this article."

This section, by allowing a court of competent jurisdiction to relieve the trustee of "any or all of the duties and restrictions" placed upon him by Article V, gives statutory authority to the court to relieve the trustee of the restriction that he cannot purchase property from the trustee.

Restatement of the Law, 2d, Trusts, Second, § 170, states:

"(1) The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary."

Comment (f) on Subsection (1) is as follows:

*"Purchase by trustee with approval of court.* The trustee can properly purchase trust property for himself with the approval of the court. The court will permit a trustee to purchase

trust property only if in its opinion such purchase is for the best interest of the beneficiary. Ordinarily the court will not permit a trustee to purchase trust property if there are other available purchasers willing to pay the same price that the trustee is willing to pay."

The reasons for the loyalty rule are evident. A man cannot serve two masters. He cannot fairly act for his interest and the interest of others in the same transaction. Consciously or unconsciously, he will favor one side or the other, and where placed in this position of temptation, there is always the danger that he will yield to the call of self-interest.

The trustee, because of his fiduciary relationship, is skating on the thin and slippery ice of presumed fraud, which he must rebut by proof that no fraud was committed and no undue influence or moral duress exerted.

There is plenary evidence in this case to rebut the presumption of fraud, undue influence and moral duress, in that: (1) The trustee has made a full and fair disclosure of all facts, (2) the trustee has offered to resign as trustee and now remains in fiduciary capacity at the insistence of the life beneficiary, (3) the trustee has offered far more than the appraised price for the *res* property, (4) the trustee is apparently in the peculiar position of finding the *res* property particularly valuable to its needs, and (5) the trustee has made a strong showing of exigency, emergency and changed conditions which justify a deviation of the trust.

Recognizing and reaffirming the stern rule of equity that a trustee cannot be both vendor and vendee, we hold that there are rare and justifiable exceptions when the court, in the exercise of its inherent equitable powers, may authorize a purchase of trust property by the trustee, upon full findings of fact that (1) complete disclosure of all facts was made by the trustee, (2) the sale would materially promote the best interests of the trust and its beneficiaries, and (3) there are no other purchasers willing to pay the same or a greater price than offered by the trustee.

## IV.

However, we must still consider whether the court erred in holding there is sufficient evidence to support the holding that no other prospect for sale of the trust property exists or is reasonably anticipated. There was no advertisement to advise the general public that the property was for sale. The record is barren of evidence that the trustee affirmatively or by any overt act sought other prospective

purchasers. In fact, the record reveals that only the trustee and the life beneficiary possessed this information.

". . . The trustees owed to their *cestuis que trust* the duty to bestir themselves, and to put forth real and good faith endeavors to find the most advantageous purchaser; and they cannot be allowed to postpone such action until after they acquired the entire title to the property, when they would be the sole beneficiaries of the fruits of their efforts to find an advantageous purchaser." *Clay v. Thomas,* 178 Ky. 199, 198 S.W. 762.

The fact that no other offers had been made, together with the fact that the trustee might put the *res* property to better economic use because it owns adjoining property, is not enough to support the trial court's finding. The trustee must show that there was adequate advertisement to advise the general public that the property was for sale, so that all possible bidders would be fully advised; the trustee must show that it affirmatively put forth real and good faith endeavors to find the most advantageous purchaser and that there are no other available purchasers willing to pay the same price the trustee is willing to pay. This precaution must be taken, not because there is fraud but because the record must show there is no appearance of or opportunity for fraud.

We hold that the trial court erred in holding that no prospect for sale of the trust property other than the sale for which this action was instituted exists or is reasonably anticipated.

It is noted that the will did not give the trustee powers of investment and re-investment, and the trustee, therefore, must be governed by the laws and rules relating to trustees and their investments.

While the instant case does not create cause for great concern as to the rights of the *cestuis que trust,* the court must erect adequate safeguards so as to prevent derogation of the rules so meticulously established and jealously guarded by our Court.

The judgment entered herein by the trial court is vacated and this cause is remanded to Buncombe County Superior Court for further finding of facts and to the end that the trustee may take appropriate action to enable the trial judge to include in his findings of fact that the trustee advertised the *res* property for sale in a newspaper having general circulation in Buncombe County once a week for not less than eight weeks, said notice of sale to be on terms substantially as proposed by the trustee and modified by this decision; and that no offer to purchase was received that would equal or better the offer proposed by the trustee. After such action is taken, the trustee may apply to the Judge of Superior Court for entry of judgment in accordance with this decision, which judg-

ment should contain minimum safeguards as follows: (a) The trustee shall receive no commissions or fees for receipt or collection of purchase price for *res* property, (b) the trustee shall have no prepayment privileges after the initial payment of 29% of the purchase price, (c) the trustee shall file and obtain approval of annual accounts for the trust as long as the bank remains indebted to the trust, (d) the trustee shall either execute a first mortgage to secure the balance of the purchase price after the initial payment or shall furnish such other security as the court may require and approve, (e) the trustee shall post adequate bond as required by provisions of G.S. 1-407, and (f) the trustee shall invest proceeds from the sale of real property in real or personal property, including stocks and bonds, subject to the rules and laws respecting trustees and investments by trustees, all subject to the order and approval of the proper court.

Error and remanded.