WINTER, Circuit Judge:
The appeal of plaintiff (No. 15,426), the executrix of her deceased husband’s estate, in her suit for refund of estate taxes, raises the question of whether the deceased’s interest in a farm, the record title of which was solely in his name, passed to his wife so as to entitle the estate to a marital deduction under 26 U.S. C.A. § 2056. It is the plaintiff’s position that notwithstanding record title she and her deceased husband owned the farm as tenants by the entireties so that the deceased’s interest passed to her by operation of law. The government’s appeal (No. 15,425) raises the question of whether the value of the charitable remainder of the trust of the husband’s residuary estate is “presently ascertainable” so as to entitle the estate to a charitable deduction in the computation of estate taxes. The government’s position is that the discretionary power of the trustees to reinvest the principal of the trust estate and to allocate and apportion receipts and expenses between principal and income rendered the ascertainment of present value impossible so as to require disallowance of the charitable deduction.
The district court made detailed findings of fact, and, without discussion or citation of supporting authorities, concluded that the farm was owned by the husband alone — thus disqualifying it, under this particular will, for the marital deduction — and that the possibility that the charitable transfer will not become effective was so remote as to be negligible — thus allowing the charitable deduction. We disagree in part with respect to the farm, but we agree with respect to deductibility of the value of the charitable remainder. We, therefore, affirm in part and reverse in part.
Since the two questions involve largely unrelated facts and legal issues, we will treat them in separate sections of this opinion.
*939 I
The Claimed Marital Deduction
A.
The testator’s will made no devise of the farm to his wife, so if he was the sole fee simple absolute owner at the time of his death, as the record title indicated, the farm would become part of his residuary estate and pass into a residuary trust in which his wife had only a life interest. This would not result in a marital deduction. But plaintiff contends that title to the farm was vested in her husband and her as tenants by the entireties, and thus, that title to the farm passed to her by operation of law, outside of the will, entitling the estate to the marital deduction. Aside from its tax consequences, the dispute does not have any bearing on the ultimate disposition of the farm, since plaintiff entered into an agreement to convey her property including whatever interest she has in the farm, to the deceased’s residuary estate.
The farm was originally acquired by the testator and his wife as tenants by the entireties. In 1944 they wished to acquire tobacco allotments from land owned by Rux Wilkins and his sister which had been the subject of condemnation. The testator paid Wilkins $850.-00 for the tobacco allotments, and the testator and his wife executed a deed of the farm to Wilkins. At the same time, Wilkins gave them his note, payable to them, in the amount of $15,000.00, secured by a purchase money mortgage recorded simultaneously with the registration of the deed from the testator and his wife to Wilkins. The testator and his wife promised to cancel the mortgage when the farm, with the increased tobacco allotment, was recon-veyed. The tobacco allotment on the farm was increased in February and April 1945, and Wilkins reconveyed the farm in November, of 1946. The deed of reconveyance was to the testator alone, but the note and the purchase money mortgage securing it were cancelled simultaneously.
During the time that record title was vested in Wilkins, the testator and his wife remained in possession and farmed the land as usual. They continued to do so after the reconveyance from Wilkins until the time of the testator’s death. At all times after the reconveyance from Wilkins, the testator and his wife believed that they held title to the farm as tenants by the entireties, and the testator so represented to his attorney at the time of the conference resulting in the preparation of his will. The plaintiff in her individual capacity has neither sought nor obtained reformation of the Wilkins deed to her late husband.
B.
The parties are in agreement that we must look to state law — here, the law of North Carolina — to determine the property interests of the parties as the foundation for deciding how the federal estate tax law is to be applied. Morgan v. Commissioner, 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585 (1940) (dictum) ; Aldrich v. United States, 346 F.2d 37 (5 Cir. 1965) (per curiam). See Kirkpatrick v. Sanders, 261 F.2d 480 (4 Cir. 1958), cert. den., 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1029 (1959). We also agree although the tax consequences sought by plaintiff may have been more readily achieved if she had applied to a North Carolina court for reformation of the Wilkins deed.
Plaintiff advances several theories how, even after the reconveyance by Wilkins, she and her deceased husband were vested with title as tenants by the entireties, or, alternatively, as tenants in common. Under the latter theory, only one-half of the value of the farm would be includable in the husband’s gross estate. We conclude that plaintiff was a tenant in common, by virtue of a resulting trust, unexecuted by the North Carolina Statute of Uses, and we will treat the several contentions collectively in stating our reasons.
When Wilkins reconveyed title to the property to plaintiff’s husband, plain *940 tiff agreed to the cancellation of her interest in the Wilkins note and the purchase money mortgage securing it. Thus, she supplied valuable consideration for the reconveyance. The record is devoid of any evidence that plaintiff intended that title be vested solely in her husband, and the evidence is that both were unaware that record title was restricted to him. Indeed, there is evidence from which it can be inferred that both believed that they were tenants by the entireties of the farm. At least the very strong inference that there was a mistake in conveyancing necessarily arises and this, coupled with the consideration supplied by plaintiff, is sufficient under North Carolina law to give rise to a resulting trust in plaintiff’s favor, so that she is constituted a tenant in common with her deceased husband. Bullman v. Edney, 232 N.C. 465, 61 S.E.2d 338 (1950). See also, Vinson v. Smith, 259 N.C. 95, 130 S.E.2d 45 (1963); Hoffman v. Mozeley, 247 N.C. 121, 100 S.E.2d 243 (1957); Waddell v. Carson, 245 N.C. 669, 97 S.E.2d 222 (1957). Indeed, the North Carolina laws seems to be that the furnishing of consideration by the wife for a conveyance solely to her husband, absent more, is probably enough to impress a resulting trust for the wife’s benefit upon the property conveyed, Deese v. Deese, 176 N.C. 527, 97 S.E. 475 (1918), although Lawrence v. Heav-ner, 232 N.C. 557, 61 S.E.2d 697 (1950), would seem to require some evidence of intention on the part of the parties that a resulting trust arise.
Plaintiff argues that if, as we conclude, a resulting trust arose, the trust, was executed by the North Carolina Statute of Uses[1] so that, by virtue of the fact that plaintiff and her husband were husband and wife, a tenancy by the entireties resulted. Plaintiff cites no North Carolina authority to support the argument that the Statute of Uses would be operative, and the general rule elsewhere is that the Statute of Uses applies only to express passive trusts and not to resulting or constructive trusts which arise by operation of law. Restatement (Second) of the Law of Trusts § 73 (1959); Bogert, The Law of Trusts and Trustees § 206 at 381 (2d ed. 1966); Scott, The Law of Trusts § 73 (3rd ed. 1967); Annotations 42 A.L.R. 55; 135 A.L.R. 232; 27 A.L.R.2d 1298. We, therefore, cannot conclude that under North Carolina law the resulting trust would be executed.[2]
Plaintiff’s remaining arguments invoke N.C.G.S. § 52-12, in effect at the time of the transactions with which we are concerned, limiting a wife’s ability to affect or change her interest in real estate by contract with her husband *941 unless there is a contract in writing and a certificate of a judicial officer that the contract is not unreasonable or injurious to the wife.[3] Specifically, plaintiff’s argument is that, prior to the conveyance to Wilkins, she and her husband owned the farm as tenants by the entire-ties. Because the conveyance to Wilkins lacked the formalities required by § 52-12 (the writing and the judicial certificate), the purported conveyance was void and plaintiff and her husband continued to hold title as tenants by the entireties. Alternatively, plaintiff argues that she could not validly relinquish her interest in the Wilkins note and mortgage without compliance with § 52-12 so that the purported reconveyance by Wilkins to her husband gave rise to a resulting trust in her favor.
Ingram v. Easley, 227 N.C. 442, 42 S.E.2d 624 (1947), and Honeycutt v. Citizens National Bank in Gastonia, 242 N.C. 734, 89 S.E.2d 598 (1955), both construed § 52-12 to provide that, testamentary devises excepted, a married woman cannot convey her real property to her husband directly or by any form of indirection without complying with the provisions of § 52-12. But we read Honeycutt as holding that the statute is applicable only when the conveyance to a third person and reconveyance to the husband is solely for the purpose of accomplishing an indirect conveyance of the wife’s property to her husband. Such is not the ease here. In addition to the evidence that plaintiff did not intend to transfer her property to her husband, it is manifest that the primary purpose of the conveyance to Wilkins was to effect a transfer of tobacco allotments to the farm, owned by Wilkins and his sister as a result of other property of theirs which had been taken by condemnation. Plaintiff’s husband paid Wilkins $850.00 for this allotment. Plaintiff and her husband obtained Wilkins’ note and a mortgage in security as consideration for the conveyance. Under these facts, we do not believe that § 52-12 was applicable to the conveyance to Wilkins.
With regard to the other aspect of plaintiff’s argument, we have already concluded that the cancellation of the note and forgiveness of the mortgage, together with the evidence of intention of the parties, was sufficient to give rise to a resulting trust. If plaintiff’s argument that § 52-12 has this same effect is meritorious, our conclusion is thereby reinforced, but we do not agree in this context, for the reasons we have already stated, that the North Carolina Statute of Uses has the effect of executing any resulting trust to which § 52-12 gave birth.
II
Deductibility of the Charitable Remainder
A.
On January 11, 1957, plaintiff and her husband entered into a trust agreement by which they created an inter vivos *942 trust naming themselves and Planters National Bank and Trust Company, Rocky Mount, North Carolina, as trustees. At the same time, they entered into an agreement to execute separate wills leaving their respective residuary estates to this trust, with the further agreement on the part of plaintiff that in the event her husband predeceased her she would transfer substantially all of her property to the trust at his death. The husband died September 21, 1960, and by his last will and testament he bequeathed his residuary estate to the trust.
Under the trust agreement the settlors retained the right to revoke any gift to the trust during such time as they both should be living. However, upon the death of either all transfers to the trust were to become irrevocable and the retained power to modify, amend or alter the trust agreement was to cease. Both before and after the trust became irrevocable, plaintiff and her husband retained the enjoyment of the income of the trust for life, with the further provision that
The trustees shall pay to or for the benefit of the settlors or the surviving settlor from time to time such sums from principal as will enable them or the survivor to maintain the standard of living to which they, or the survivor, are accustomed at the time of the creation of this trust, taking into account such other sources of income and capital resources as they or the survivor may have in addition to income from this trust.
The remainder of the estate, upon the death of the surviving spouse, was directed to be paid to the Baptist Children’s Home of North Carolina, concededly a charitable organization within the meaning of § 2055 of the Internal Revenue Act of 1954.
It was stipulated that after the husband’s death the anticipated costs of maintaining plaintiff according to the standard to which she was accustomed at the time the trust was created amounted to $5,500.00 per year, and that the expected income from the trust as of the date of the husband’s death was $13,-740.00 per year.
The trust agreement contained numerous provisions relating to the powers of the trustees. We set forth in the margin those on which the government relies for disallowance of the deduction of the value of the charitable remainder.[4] In the *943 exercise of these and the other powers conferred under the trust agreement, the corporate trustee was required to render its annual account of the receipts, disbursements, and distributions of both principal and income only to the income beneficiaries of the trust.
*934 As discussed in note 2, supra, this provision has now been repealed; and under the new Act, Congress, eschewing the presumption, has prohibited possession directly.
*943 On the husband’s federal estate tax return, plaintiff, as his executor, claimed a charitable deduction of $130,073.19, representing some 60% of the total value of their residuary estate — the actuarial value specified in the Treasury Regulations on Estate Tax for a remainder interest subject to a life estate of a person sixty years old, which was plaintiff’s age on the date of her husband’s death.
B.
The Internal Revenue Code of 1954 permits the deduction from a decedent’s gross estate of the value of bequests, legacies, devises or other transfers to or for the use of any charitable organization as defined therein. 26 U.S.C.A. § 2055(a). The long-standing provisions of the Treasury Regulations on Estate Tax state that, with respect to testamentary transfers of charitable remainders, the actuarially computed value of the charitable remainder is deductible “only insofar as that interest is presently ascertainable, and hence severable from the noncharitable interest.” (emphasis added.) If the transfer is conditioned on the performance of some act or the happening of some event, the deduction will be allowed only if “the possibility that the charitable interest will not become effective is so remote as to be negligible.” 26 C.F.R. §§ 20.2055-2(a) and (b).[5] The additional restrictions on charitable deductions imposed by the Tax Reform Act of 1969, P.L. No. 91-172, 83 Stat. 487, are not involved because that Act was passed after the events at issue here.
In Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), the decedent established a testamentary trust for the benefit of his wife for her life, with remainder to charity. The trustee, however, was directed to invade the principal to the extent necessary to maintain the wife “in as much comfort as she now enjoys.” The Court found that this standard of invasion was “fixed in fact and capable of being stated in definite terms of money,” and that the income of the es *944 tate was more than enough to support the wife. It, therefore, allowed the deduction, noting that “[t]here was no uncertainty appreciably greater than the general uncertainty that attends human affairs.” 279 U.S. at 154, 49 S.Ct. at 291. In the instant case, the government concedes that the trustees’ power to pay principal to the plaintiff is limited by an ascertainable standard — plaintiff’s previous living standard — and hence there is no argument that the de-ductibility of the charitable remainder is destroyed by the power of invasion.[6] Rather, it is argued that the trust agreement confers such broad administrative powers on the trustees as to permit them indirectly to divert the corpus of the trust to the plaintiff, and that these powers, together with the broad power to make investments, including the purchase of annuity contracts, which favor the income beneficiary at the expense of the remaindermen, have the cumulative effect of rendering not “presently ascertainable” the value of the charitable remainder, and making more than “remote” the possibility that the charitable transfer will never become effective.
Perhaps the genesis of the government’s argument is the analogous case of State Street Trust Co. v. United States, 263 F.2d 635 (1 Cir. 1959), in which a divided court (Magruder, C. J., dissenting) held that property a decedent had transferred to a trust for the benefit of his children was nevertheless includable in his gross estate under § 811 of the Internal Revenue Code of 1939, which required inclusion of property transferred in contemplation of death where the decedent had “retained * * * the right * * * to designate the persons who shall possess or enjoy the property,” or where “the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or * * * in conjunction with any other person * * * to alter, amend, revoke, or terminate * * *.” 26 U.S.C.A. § 811(c) and (d). The deceased was a cotrustee at the time of his death. The court held that discretionary powers conferred by the trust instrument, similar to the ones at issue in the present case, gave so much power to the trustees to affect the rights of the remaindermen and lifeholder that the statutory conditions for exclusion were not satisfied.
But State Street was effectively overruled in Old Colony Trust Co. v. United States, 423 F.2d 601 (1 Cir. 1970), which held that, in the context of broad administrative powers resembling those in the present case, “no aggregation of purely administrative powers can meet the government’s amorphous test of ‘sufficient dominion and control’ so as to be equated with ownership.” 423 F.2d at 603. Again, the estate tax problem was not that of the deductibility of a charitable remainder, but the question of whether the corpora of the trusts were includa-ble in the settlor-trustee’s gross estate. The significance of the case is in its recognition that, at least under Massachusetts law, broad management powers, even coupled with insulation for liability for mismanagement, could not relieve a trustee of the duty to administer the estate equitably for the benefit of all interests in the trust and that “trustee powers are [not] to be more broadly construed for tax purposes than the probate court would construe them for administrative purposes.” 423 F.2d at 603.
The government has persisted in its advocacy of the now repudiated State Street view.[7] And it has gained some *945 converts. Rand v. United States, 445 F. 2d 1166 (2 Cir. 1971); Estate of Stewart v. Commissioner, 436 F.2d 1281 (3 Cir. 1971); Miami Beach First National Bank v. United States, 443 F.2d 475 (5 Cir. 1971); First National Bank in Palm Beach v. United States, 443 F.2d 480 (5 Cir. 1971). Cf. Florida Bank at Lakeland v. United States, 443 F.2d 467 (5 Cir. 1971); Van Den Wymelenberg v. United States, 397 F.2d 443 (7 Cir.), cert. den., 393 U.S. 953, 89 S.Ct. 377, 21 L.Ed.2d 364 (1968). On the other hand, many courts have concluded that general administrative powers held by a trustee are subject to a fiduciary responsibility and duty to be exercised impartially as between the life tenant and remainder-man and that, therefore, the deductibility of the charitable remainder is not lost. Bankers Trust Co. v. United States, 308 F.Supp. 545 (S.D.N.Y.1970), aff’d. on other grounds, 438 F.2d 1046 (2 Cir. 1971); Gardiner v. United States, (D. Ariz.1969), appeal pending to the Ninth Circuit. Cf. Peoples Trust Co. of Bergen County v. United States, 311 F.Supp. 1197 (D.N.J.1970), judgment affirmed 444 F.2d 193 (3 Cir. 1971); Estate of Edward E. Ford, 53 T.C. 114 (1969); William T. Grant, 48 T.C. 606 (1967); William D. O’Brien, 46 T.C. 583 (1966).
None of the authorities sustaining the government’s position holds that broad administrative powers always or never prevent the deduction; rather, the cases rely heavily on the trust law doctrines and practices of the particular states involved, as well as the language of the trust instrument under consideration, to determine if there is any real likelihood that the interests of the charitable re-mainderman can be invaded for the benefit of the life tenant. Thus, in Stewart, supra, the court based its denial of the deduction in part on the conclusion that under New York law the trustee could “shift ‘very substantially * * * the economic benefits of the trusts between the life tenants and the remaindermen.’ ” 436 F.2d at 1288. In Rand, supra, where the trustees’ powers were unusually broad, the court stated that there was no indication that Vermont law, applicable to the trust at issue, would prevent a “gross depletion of the remainder,” for example by investment in wasting assets which would leave “little or no remainder * * * for the charities.” 445 F.2d at 1170. The cases rejecting the government’s position have also rested on the trust law doctrines and practices of the particular states involved as well as the language of the trust instrument under consideration although they have evidenced greater liberality in sustaining some flexibility in the administration of the trust without disallowance of the charitable deduction. Thus, we are brought to a consideration of the law of North Carolina with regard to the administration of this trust as the basis of decision of this case.
To start with the language of the instrument, the government places particular stress on the aggregate of the trustees’ powers (a) to invest generally in such property and in such proportions of such property as the trustees shall deem advisable, even though such investment shall not be of the character nor in the proportion approved by applicable law, (b) to invest in an annuity contract for the benefit of the widow, and *946 (e) to allocate and apportion expenses and receipts to principal and income in their “uncontrolled discretion,” with the further protection that the trustees’ “allocation or apportionment shall be conclusive,” urging that singly and collectively their exercise will permit substantial invasion of the remainder interest to the detriment of the remainderman and benefit of the life tenant. The government finds further significance in the provision that the corporate trustees’ annual accounting need be made only to the life beneficiary. To illustrate how substantial invasion may occur, the government suggests, in regard to the power to invest in any type of property in any proportion, the possibility that the trustees may invest in a wasting asset without making provision for amortization of the asset or other reserve for the return of corpus. In regard to the power to allocate and apportion expenses and receipts, the government contends that this power may be used to divert corpus to the income beneficiary if the trustees, in the exercise of their uncontrolled discretion, charge a premium on securities purchased at a premium to corpus, but treat the full return on such securities as income payable to the life beneficiary. The government also suggests that the trustees, in the exercise of their uncontrolled discretion, could elect to allocate stock dividends to the income beneficiary so that, again, a portion of the value of the corpus would be diverted to the nonchar-itable life income beneficiary. Finally, the government argues that the trustees might even allocate capital gains to income but capital losses to principal since they are vested with “uncontrolled discretion” to make allocations, notwithstanding that both gain and loss on the sale of investment assets would ordinarily be allocable to corpus, Edgecombe Bank & Trust Co. v. Barrett, 238 N.C. 579, 78 S.E.2d 730 (1953).
The law of North Carolina, as elsewhere, is that short of an intention to achieve illegal objectives, the intention of the testator-settlor should prevail, and in determining that intent a court will look at all of the language employed as well as the attendant circumstances. Campbell v. Jordan, 274 N.C. 233, 162 S.E.2d 545 (1968); Callaham v. New-som, 251 N.C. 146, 110 S.E.2d 802 (1959); Wachovia Bank & Trust Co. v. Steele’s Mills, 225 N.C. 302, 34 S.E.2d 425 (1945). Here, the manifest intent by plaintiff and her husband was to retain a life interest in income for themselves, and the survivor of them, but only to the extent of maintaining their accustomed mode of living, with a remainder for charity. Not only did plaintiff, the surviving life tenant, act as one of the settlors of the inter vivos trust, naming herself as one of the trustees, she entered into a contract that she would transfer substantially all of her property to the trust upon her husband’s death (if she survived him) and that she would execute a will leaving her residuary estate to the trust. There is thus a strong evidence of an intention to create, preserve and protect an admittedly charitable remainder.
In addition to the circumstances surrounding the establishment of the trust and creation of the charitable remainder, the intention of the settlors with respect 'to invasion of corpus for themselves is manifest from the express language granting the power to invade, which they employed. They authorized invasion to maintain their standard of living, or that of the survivor — a recognizable and enforceable standard — and directed that invasion be undertaken only after consideration of their, or the survivor’s, other sources of income and capital resources. This express power to invade has both its positive and negative implications. Not only does it permit corpus to be advanced to them under the conditions stated, it also manifests an intention that corpus not be used for the benefit of them or the survivor, except under the conditions stated. Cf. Campbell v. Jordan, supra, 162 S.E.2d at 551. The specific intention embodied in their express power, in our view, limits the more general powers granted *947 to the trustees. That is to say, the trustees, in exercising their general powers of administration, must exercise them within the framework of the overall intention of the settlors as they expressed it.
North Carolina is not hesitant to exercise judicial control over private trusts, including private charitable trusts, not only to enforce them but also to protect the rights of persons having an interest therein. First-Citizens Bank & Trust Co. v. Rasberry, 226 N.C. 586, 39 S.E.2d 601, 603 (1946) (dictum), and the subsequently cited cases adjudicating the rights of beneficiaries with respect to one another and to their trustees. The Attorney General of North Carolina has express statutory and common law authorization to enforce charitable trusts. N.C.G.S. §§ 36-19 and 36-20 (1966); Sternberger Foundation v. Tannenbaum, 273 N.C. 658, 161 S.E. 2d 116 (1968).
North Carolina has explicitly referred approvingly to the rule that a trustee must deal impartially with the beneficiaries of a trust in Campbell v. Jordan, supra, 162 S.E.2d at 551, and it has done so impliedly in numerous cases. This is the general rule, Restatement (Second) of the Law of Trusts § 183 (1959); and, to our knowledge, it has not been rejected by the courts of any state. While North Carolina may have infrequently exerted judicial control over the manner in which discretionary powers of trustees have been exercised, it has not hesitated to do so in an appropriate case. Albright v. Albright, 91 N.C. 220 (1884); Carter v. Young, 193 N.C. 678, 137 S.E. 875 (1927); Woodard v. Mordecai, 234 N.C. 463, 67 S.E.2d 639 (1951); Dillon v. North Carolina National Bank, 6 N.C.App. 584, 170 S.E.2d 571 (1969). See also, Lightner v. Boone, 222 N.C. 205, 22 S.E.2d 426 (1942), aff’d., 319 U.S. 561, 63 S.Ct. 1223, 87 L.Ed. 1587 (1943). Albright and Carter equate an abuse of discretion on the part of a trustee with “fraud” or “bad faith” or “improper motive,” but they are important because of their recognition that these invidious labels apply to action clearly contrary to the intention of the settlor of a trust as well as to acts of moral or tortious legal impropriety. Their repeated citation in the later authorities attests to the continuing viability of this concept. As recently as the decision in Little v. Wa-chovia Bank and Trust Company, 252 N.C. 229, 113 S.E.2d 689 (1960), the court, in stating the general rule that a trustee’s exercise of a discretionary power will generally be upheld in the absence of fraud or arbitrary action, added the caveat “[o]f course the trustee will not be given ‘unlimited power to make allocations as between income and principal in contravention of the intent of the settlor as indicated by the terms of the trust instrument as a whole.’ Annotation: 27 A.L.R.2d, Income and Principal, p. 1325.” 113 S.E.2d at 708.
We have not found, nor has there been cited to us, any North Carolina case dealing explicitly with the limits of the “absolute direction” vested in the trustees to allocate and apportion expenses and receipts between the interests of the beneficiaries and the circumstances, if any, under which their exercise of the power will be judicially controlled. Ordinarily a settlor’s use of such language, with or without the further protection that the trustee’s exercise of the power shall be “conclusive”-— present here — is treated as conferring even greater authority on the trustee than a simple and unqualified grant of discretion. Restatement (Second) Law of Trusts § 187 (1959), comment j, pp. 408-409; Scott, The Law of Trusts § 187, p. 1502 (3rd ed. 1967). These authorities recognize that the addition of such language dispenses with the otherwise applicable test of “reasonableness,” but they do not fail to add that a trustee is not thereby given unlimited discretion and his exercise of “absolute discretion” is still circumscribed by the intention of the settlor. We have little doubt that North Carolina would pay close attention to the intention of a settlor in determining whether a trustee *948 exceeded his authority in exercising a grant of “absolute discretion.” We, therefore, conclude that in this case North Carolina would permit the exercise of “absolute discretion” to apportion and allocate expenses and receipts only within the framework of the set-tlor’s intent to invade the charitable remainder only to the extent of maintaining the settlor’s accustomed mode of living. And in this case, inasmuch as the surviving life beneficiary — the wife — is one of the trustees, our view is reinforced with respect to the exercise of this power, as well as any other which may be capable of being exercised to prefer the life beneficiary over the remainderman by the stringent limiting rules of conduct which govern a trustee’s acting for his own benefit. Wachovia Bank and Trust Co. v. Johnston, 269 N.C. 701, 153 S.E.2d 449 (1967).
To supplement this expression of what we perceive general North Carolina law to be, we need add only a few comments in response to specific arguments advanced by the government. With regard to the treatment of stock dividends, the trustees’ powers of allocation are sufficiently broad to permit them to classify stock dividends either as corpus or as income. But we think the matter of little moment. In North Carolina, absent an express power of this breadth, stock dividends would be treated as principal. N.C.G.S. § 37-5(a) (1966). This is ordinarily called the Massachusetts rule. But in many states the rule at common law is to the contrary and requires a determination of the portion of the stock dividend attributable to income and the portion attributable to corpus and the various portions to be charged accordingly. This is generally referred to as the Pennsylvania rule. Taggert, Charitable Deductions for Transfers of Remainder Interests Subject to Invasion, 21 Tax L. Rev. 535 (1966). In oral argument the government candidly admitted that in states following the Pennsylvania rule, the government would not contend that the deductibility of an otherwise deductible charitable remainder would be lost thereby. We canot see, therefore, how the trustees’ power in the instant case, taken alone or in conjunction with their other powers, should make any difference in the decision of this case.
With regard to the trustees’ power to purchase an annuity on the life of the life beneficiary, we do not think that under the general law stated, on the facts of this case, that the trustees could use any substantial portion of the corpus to purchase an annuity, or any other wasting asset, without making provision for the establishment of a reserve to reimburse corpus or to amortize the depreciation thereon. Indeed, with respect to annuities, N.C.G.S. § 36-4.1 (1966) requires specific court approval as a condition precedent to the purchase of a single premium annuity by a trustee even from income. We would view it very unlikely that judicial approval would be readily forthcoming here without amortization of any principal employed to pay the premium where the life tenant requires $5,500.00 to maintain her accustomed mode of living but is receiving over twice that amount. The statute has not received judicial construction, but we think it equally unlikely that it could be avoided by the trustee here in the absence of a specific reference to it by the settlors and specific authorization to the trustees to avoid compliance with it. Our conclusion is the same with regard to the purported power to charge the premiums paid on securities purchased to corpus, while treating the entire return, except repayment of principal upon maturity, as income,[8] and the purported power to *949 treat capital gains as income while treating capital losses as chargeable to principal in contravention of Edgecombe Bank & Trust Co. v. Barrett, supra. Under this trust when the settlor’s full intention is given effect, we do not think that preferment of the life beneficiary by the exercise of these powers would receive judicial approval.
To summarize, we conclude that, under the law of North Carolina and on the facts of this case, the legal right of the trustees to effect an indirect diversion of corpus to the detriment of the charitable remainderman under their general powers of administration is so limited and restricted that it cannot be said that the charitable remainder was not “presently ascertainable” at the date of the husband’s death or that “the possibility that the charitable interest will not become effective” is other than so remote as to be negligible. We, therefore, agree with the district judge that the charitable deduction claimed by the plaintiff should be sustained.
Reversed in part; affirmed in part.

. N.C.G.S. (1966) § 41-7:
Possession transferred to use in certain conveyances. — By deed of bargain and sale, or by deeds of lease and release, or by covenant to stand seized to use, or deed operating by way of covenant to stand seized to use, or otherwise, by any manner or means whatsoever it be, the possession of the bargainor, releasor, or covenanter shall be deemed to be transferred to the bargainee, releasee, or person entitled to the use, for the estate or interest which such person shall have in the use, as perfectly as if the bargainee, releasee or person entitled to the use had been enfeoffed at common law with livery of seizin of the land intended to be conveyed by such deed or covenant.

. This conclusion, which also encompasses constructive trusts, makes unnecessary further refinement of whether plaintiff’s interest arises as a result of a resulting or a constructive trust. The North Carolina cases tend to classify the trust under these circumstances as a resulting trust. Restatement (Second) of Trusts § 440 (1959) is in accord. If we were to conclude that plaintiff had an interest in the farm on the theory of constructive trust, we would be faced with the nice problem of whether a constructive trust relates back to the date of original conveyance so that plaintiff’s interest was in existence at the time of her husband’s death and thus would qualify the farm for the marital deduction. On this point there is a split of authority and no North Carolina decisions of which we are aware. Compare, Bogert, Trusts and Trustees (2d ed.) § 472 with Scott on Trusts (3rd ed.) § 462.4.

. In 1965 § 52-12 was rewritten and re-codified as N.C.G.S. § 52-6. As it existed, at the time with which we are concerned, it provided:
Contracts of wife with husband affecting corpus or income of estate. — (a) No contract between husband and wife made during their coverture shall be valid to affect or change any part of the real estate of the wife, or the accruing income thereof for a longer time than three years next ensuing the making of such contract, or to impair or change the body or capital of the personal estate of the wife, or the accruing income thereof, for a longer time than three years next ensuing the making of such contract, unless such contract is in writing, and is duly proven
as is required for the conveyances of land; and such examining or certifying officer shall incorporate in his certificate a statement of his conclusions and findings of fact as to whether or not said contract is unreasonable or injurious to her. The certificate of the officer shall be conclusive of the facts therein stated. But the same may be impeached for fraud as other judgments may be. (emphasis added.)
(b) This section shall not apply to any judgment of the superior court which, by reason of its being consented to by a husband and his wife, or their attorneys, may be construed to constitute a contract between such husband and wife. * * *

. ITEM ELEVEN. Powers of Trustees. Without distinguishing between their or their successors’ or substitutes’ powers as trusteés, and by way of illustration and not of limitation and in addition to any inherent or implied or statutory powers they may have now or hereafter acquire in such capacity, we grant the following powers to our trustees and their successors or substitutes. Whenever the singular forms, (“my”, “I”, “trustee”) is used herein, it is intended to include the plural forms unless the context indicates a contrary intention.
Section 1. Retain original investments. To retain any of the original property in my estate, including any stock we may have in the Planters National Bank and Trust Company or its successor, regardless of the character of such property or whether it shall be such as then will be authorized by law for trust investments or whether it shall leave a disproportionately large part of the trust invested in one type of property, or even in cash unin-vested, for such time as to our trustees shall seem best, and to' dispose of such property by sale, exchange, or otherwise, as and when it shall deem advisable. Section 2. Make new investments. To invest and reinvest in stocks (common or preferred), including stock and stock rights in the Planters National Bank and Trust Company or its successor; in bonds, notes, or mortgages on property in or outside the State of North Carolina ; in insurance contracts on the life of any beneficiary or of any person in whom a beneficiary has an insurable interest; or annuity contract for any beneficiary; in real property whether or not it is productive at the time of investment ; in participations in common trust funds established by the Planters National Bank and Trust Company or its successor; and generally in suoh property and in such proportions of such property as it shall deem advisable, even though such investment shall not be of the character nor in the proportion approved by applicable law for this provision.
Hs ífc íjí Hi # *943 Section 18. Employ and Compensate. To employ and compensate, out of income or principal or botli and in such proportions as to it shall seem proper, agents, accountants, brokers, attorneys at law, attorneys in fact, investment brokers, realtors, tax specialists, and other assistants and advisers deemed by it needful for the proper settlement of my estate and administration of my trusts; and to do so without liability for any neglect, omission, misconduct, or default of such agent or representative provided he was selected and retained with due care on the part of my executor or trustee.
* * s¡: * *
Section 23. Apportion and allocate receipts and expenses. To determine what is principal and what is income of any trust and to allocate or apportion receipts and expenses as between principal and income in the exercise of its uncontrolled discretion, and, by way of illustration and not limitations of its discretion, to charge premiums on securities purchased at a premium against principal or income or partly against each; to apply stock dividends and other noncash dividends to income or principal or apportion them as it shall deem advisable; to determine what expenses, costs, taxes (other than estate, inheritance, and succession taxes and other governmental legacy charges) shall be charged against principal or income or apportioned between principal and income and in what proportions; to change its plan of allocation or apportionment of receipts and expenses at any time and from time to time as it shall deem advisable, and its allocation or apportionment shall be conclusive, (emphasis added.)

. The Regulations further provide :
If the trustee is empowered to divert the property or fund, in whole or in part, to a use or purj)ose which would have rendered it, to the exent that it is subject to such power, not deductible had it been directly so bequeathed, devised or given by tlie decedent, the deduction will be limited to that portion, if any, of the property or fund which is exempt from an exercise of the power, (emphasis added.) 26 C.F.R. § 20.2055-2 (b).

. In fact, this power to invade corpus is even more limited than in Ithaca Trust, since the trustees must also take into account such sources of income and capital resources as the life income beneficiary may have other than income from the trust.

. As of the time the brief of the United States was filed in this ease (May 15, 1971), we were advised that the same question was pending in at least six other eases, viz.,
(1) Gardiner v. United States, 24 A.F. T.R.2d 6108 (Ariz., May 21, 1969), appeal pending C.A. 9;
*945 (2) Miami Beacli First Nat. Bk. v. United States, 25 A.F.T.R.2d 1502 (S.D.Fla., December 23, 1969), appeal pending C.A. 5;
(3) First Nat. Bk. in Palm Beach v. United States, 25 A.F.T.R.2d 1588 (S.D.Fla., August 22, 1969), appeal pending O.A. 5;
(4) Peoples Trust Co. of Bergen County v. United States, 311 F.Supp. 1197 (N.J., 1970), appeal pending C.A. 3;
(5) Florida National Bank at Lakeland v. United States, 313 F.Supp. 1072 (M.D.Fla., 1970), appeal pending C.A. 5;
(6) Rand v. United States, decided November 9, 1970 (Conn.), pending C.A. 2.
The ease in the Second Circuit and the three cases in the Fifth Circuit have been subsequently decided in the government’s favor, the citations of which are set forth in the text.

. We note that absent the express power in this trust, N.C.G.S. § 87-6 (1906) would appear to require charging both the premium paid on a security purchased and any loss realized upon maturity to principal. Any exercise of the power in derogation of the statute could, therefore, only aid in the preservation of the charitable remainder.